Robert J. COULTER, Plaintiff,

v.

**CIGNA PROPERTY & CASUALTY COMPANIES, Defendant.**

No. C 94–3070–MWB.

United States District Court,
N.D. Iowa,
Central Division.

Aug. 14, 1996.

Robert K. DuPuy, LaMarca & Landry, P.C., West Des Moines, Iowa, for Plaintiff Robert J. Coulter.

Joseph M. Barron, Peddicord, Wharton, Thune, and Spencer, P.C., Des Moines, Iowa, for Defendant CIGNA Property and Casualty Companies.

**MEMORANDUM OPINION AND ORDER REGARDING PARTIES' JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT**

BENNETT, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION AND BACKGROUND ...................................1103
   A. Coulter's Actions As Executor ...........................................1103
   B. The Underlying Lawsuit ..................................................1104
   C. CIGNA's Response To The Underlying Lawsuit ...........................1105
   D. The Present Lawsuit .....................................................1105

II. STANDARDS FOR SUMMARY JUDGMENT ..............................1106

III. FACTUAL BACKGROUND ..............................................1107
   A. Coulter's Actions Involving The Estates...................................1107
   B. Eloise And Susan Kaster As Executors ...................................1110
   C. Coulter's Insurance Policy ...............................................1111

IV. LEGAL ANALYSIS .....................................................1111
   A. General Insurance Principles .............................................1113
      1. Insurer's duty to defend ..............................................1113
      2. Ambiguity of terms in an insurance policy .............................1113
   B. "Property Damage" Under The CIGNA Policy.............................1115
      1. Requirement of physical damage or destruction ........................1116
         a. Iowa law........................................................1116
         b. Other jurisdictions ...............................................1118

      i.   Ehlers and Dixon. ........................................1118
     ii.   American Home. .......................................1119
    iii.   Analysis of CGL language ...............................1120
    iv.   Analysis of Coulter's policy with CIGNA. ....................1121
   2.   Loss of use of tangible property ...................................1122

V.  CONCLUSION.........................................................1124

---

This joint motion for partial summary judgment requires the court's analysis of the definition of "property damage" in a homeowners insurance policy and a determination of whether the underlying lawsuit against the plaintiff alleges physical damage or destruction to tangible property. In the underlying lawsuit, beneficiaries of two estates for which plaintiff served as executor alleged plaintiff had breached his common law, statutory, and fiduciary duties to them by mishandling and depleting the assets of these estates. Plaintiff asserts that the damages asserted in the underlying lawsuit are loss of use damages to tangible property which are covered by his homeowner's insurance policy issued by defendant as "property damage." Defendant asserts that the definition in defendant's policy of "property damage" requires physical damage or destruction to tangible property in order to recover loss of use damages. Furthermore, defendant argues that even if there is no physical damage requirement in order to recover loss of use damages, the underlying lawsuit fails to allege a loss of use to tangible property.

## I. INTRODUCTION AND BACKGROUND

This lawsuit involves a dispute between plaintiff insured, Robert J. Coulter, and defendant insurance company, CIGNA Property and Casualty Companies, in which Coulter contends that his homeowners liability policy should provide insurance coverage for property damage caused by his breach of fiduciary duty as executor of two estates. The genesis of this dispute is Coulter's breach of his fiduciary duty to the sole beneficiaries of those estates. Before examining the intricacies of this lawsuit, it is helpful to review the actions of Coulter and his involvement with those estates.

### A. Coulter's Actions As Executor

Coulter was a lifelong friend and business associate of James Kaster. Kaster and his mother, Merle Kaster, passed away within a few months of each other in 1980; in both of their wills, they had appointed Coulter as executor. Eloise and Susan Kaster were the sole beneficiaries of the wills. After his appointment, Coulter hired an attorney, William Miles, to represent the estates.

At the time of his death, James Kaster and his insurance agency in Corydon, Iowa, were indebted both to Corydon State Bank and to Security Savings Bank of Williamsburg. At that time, Coulter was president of Security Savings Bank, and Miles was a controlling shareholder of Corydon State Bank. During his brief tenure as executor, Coulter authorized the use of the insurance agency's cash income and the cash assets of James Kaster's estate to pay all of Kaster's debts to Security Savings Bank and a significant portion of Kaster's debt to Corydon State Bank. After serving as executor for both wills for less than a year, Coulter resigned as executor of both estates in July 1981 and secured the appointment of Eloise and Susan Kaster ("the Kasters"), the sole beneficiaries under both wills, as successor executors of the James and Merle Kaster estates, respectively.

Miles continued to deplete the money remaining in the Kaster estates for the benefit of his bank and failed to take any meaningful steps toward closing the estates for most of the next decade after Coulter's resignation. At the close of 1990, Miles withdrew as counsel to the estates under pressure from the court and the Kasters, and Don Clark of Creston, Iowa, was appointed as both attorney and successor executor of the estates by the Probate Court on January 3, 1991. Clark completed the work on the estates, and they were finally closed on July 30, 1993. The net value of the estates had been re-

duced by seventy-five percent during the time the estate was in probate.

### B. The Underlying Lawsuit

On June 6, 1994, the Kasters filed a lawsuit against Coulter and Miles, alleging that they had breached their common law, statutory, and fiduciary duties to the Kasters. Regarding the estate of James Kaster,[1] the Kasters claimed they had "lost much of the value of the estate of James Kaster, and interest income that could have been derived therefrom, have incurred legal fees and expenses paid to [Coulter and Miles], and to other attorneys in attempting to settle the estate, have and will incur additional legal fees and expenses in this action resulting from [Coulter and Miles'] breach, have incurred and will incur liability for interest and penalties on additional taxes, and attorney's fees for the preparation of delinquent federal and state tax returns, have suffered emotional pain and anguish at the loss of their inheritance resulting from [Coulter and Miles'] breach." (Joint Statement of Facts, Exhibit 33, pp. 33–34). The Kasters alleged the same damages on behalf of the estate of Merle Kaster as well.[2] The malpractice law-

1. The particulars of the Kasters' lawsuit on behalf of the estate of James Kaster alleged that Coulter breached his duties by

(a) failing to timely carry out the intent of the testator, James Kaster, to liquidate the estate's assets and invest the proceeds for the benefit of the heirs, Eloise and Susan Kaster;

(b) failing to timely sell Kaster Insurance, in harmony with the intent of the testator, James Kaster;

(c) failing to seek and obtain court approval for the continued operation of Kaster Insurance, and its management by Plaintiff Susan Kaster;

(d) placing Susan Kaster in charge of Kaster Insurance when he knew that she was an inexperienced and unlicensed person, unable to properly operate this type of business;

(e) failing to obtain appraisals on, and list for sale, Kaster Insurance and the James Kaster farm real estate and operation;

(f) failing to use the then available liquid assets of the estate, such as cash, stocks, bonds, etc., to pay required taxes;

(g) failing to seek and utilize the services of a temporary administrator to deal with the claims of his bank, Security Savings Bank, and William Miles' bank, Corydon State Bank, against the Estate of James Kaster;

(h) utilizing the cash proceeds of the Faye Bailey Estate to pay the James Kaster Estate's debt to his own bank, and to pay part of the estate's debt to Miles' bank, instead of applying this cash to the payment of estate taxes;

(i) failing to promptly conduct the affairs of the Estate of James Kaster;

(j) failing to avoid conflicts of interest between the estate, of which he was executor, and the Security Savings Bank, of which he was president;

(k) failing to act affirmatively to preserve the assets of the estate in harmony with the intent of the testator;

(l) failing to adhere to the Iowa Code as alleged herein;

(m) selecting Miles, an attorney whom Coulter considered to be incapable of competently and zealously probating the Estate of James Kaster;

(n) not replacing Miles as attorney when he did not perform his duties as attorney competently or zealously;

(o) securing the appointment of Eloise Kaster to be successor executor of the Estate of James Kaster, when Coulter knew that she had no experience as an executor, or in the business and finance areas that were involved in serving executor of the Estate of James Kaster;

(p) failing to inform Eloise Kaster of her duties, rights, and responsibilities as successor executor of the Estate of James Kaster;

(q) failing to inform Eloise Kaster as successor executor of the Estate of James Kaster of Miles' lack of competence, lack of interest, lack of cooperation, and actual resistance to completing the work of probating the Estate of James Kaster; and

(r) failing to act as a reasonable executor under the circumstances then and there existing.

2. Regarding the claims on behalf of the Estate of Merle Kaster, the Kasters alleged that Coulter breached his duties by

(a) failing to timely carry out the intent of the testator, Merle Kaster, and/or the most reasonable, prudent probate plan, by liquidating the estate's assets and investing the proceeds for the benefit of the heirs, Eloise and Susan Kaster;

(b) failing to obtain appraisals on, and list for sale, the Merle Kaster farm real estate and operation;

(c) failing to promptly conduct the affairs of the Estate of Merle Kaster;

(d) failing to act affirmatively to preserve the assets of the estate in harmony with the intent of the testator;

(e) failing to adhere to the Iowa Probate Code as alleged herein;

(f) selecting Miles, an attorney whom Coulter considered to be incapable of competently and zealously probating the Estate of Merle Kaster;

(g) not replacing Miles as attorney when he did not perform his duties as attorney competently or zealously;

(h) securing the appointment of Susan Kaster to be successor executor of the Estate of Merle-

suit against Miles was settled for an amount equal to twice the "per claim" limits of Miles' professional liability policy.

### C. CIGNA's Response To The Underlying Lawsuit

Robert Coulter had a homeowners/general liability insurance policy issued by CIGNA for the period from October 31, 1980, through October 31, 1982, which provided "occurrence" coverage, as opposed to "claims made" coverage. Coulter's attorney at that time placed CIGNA on notice of the claims of the estates of James and Merle Kaster on March 14, 1994, and requested defense and indemnity of the claims. On May 13, 1994, CIGNA issued a letter denying coverage and declining to defend Coulter.

With the permission of Coulter's counsel, counsel for the Kasters responded to CIGNA's May 13, 1994 letter, seeking CIGNA's reconsideration of its decision and inviting CIGNA to participate in a scheduled mediation on July 7, 1994. Following the mediation, Coulter, through his attorney, entered into settlement negotiations with counsel for the estates. On July 18, 1994, the Kasters' attorneys again wrote to CIGNA, suggesting it participate in the settlement negotiations. Finally, on July 18, 1994, CIGNA responded to the letters of the Kasters, reiterating its declination of coverage and refusing to participate in settlement negotiations. However, also in that letter, CIGNA indicated that the attorneys should proceed with their case "as [they] see fit with [their] clients." On August 30, 1994, the Kasters entered into a settlement agreement with Coulter in which Coulter paid $21,000.00 in partial settlement and assigned his rights under his CIGNA policy to the Kasters as additional consideration for the release provided.

### D. The Present Lawsuit

On September 23, 1994, Coulter filed suit against CIGNA, requesting a declaration of "the rights and other legal relations between the parties with regard to the insurance contract issued by [CIGNA] to [Coulter] and the claims of the executors and heirs of the estates of James and Merle Kaster regarding the liability of [Coulter] under that insurance policy/contract." (Complaint ¶ 21.). Specifically, Coulter cited three issues for the court's consideration: (1) whether the loss of, and the loss of use of "tangible property" of the estates of James and Merle Kaster was included in the claims of the estates; (2) whether the policy exclusion for legal responsibility assumed under an unwritten contract or agreement can exclude coverage under a written agreement to accept an appointment as an executor of an estate; and (3) whether the acts and omissions of Coulter constituted negligence and/or breach of fiduciary duty which proximately caused damage to the estates of James and Merle Kaster. Furthermore, Coulter also alleged that CIGNA acted in bad faith in refusing to defend Coulter, denying the Kasters' claims without a reasonable basis, failing to conduct a proper investigation, and failing to subject the findings of its investigation to a reasonable evaluation and review.

With permission of this court, the parties submitted a joint motion for partial summary judgment and a joint statement of undisputed facts, in an attempt to dispose of some of the legal issues in this lawsuit. Both Coulter and CIGNA have submitted briefs and reply briefs, and the court heard oral argument on these briefs in a telephonic hearing on June 27, 1996. Plaintiff Robert Coulter was represented by Robert K. DuPuy, LaMarca & Landry, P.C., West Des Moines, Iowa.[3] Defendant CIGNA was represented by Joseph

---

Kaster, when Coulter knew that she had no experience as an executor, or in the business and finance areas that were involved in serving executor of the Estate of Merle Kaster;

(i) failing to inform Susan Kaster of her duties, rights, and responsibilities as successor executor of the Estate of Merle Kaster;

(j) failing to inform Susan Kaster as successor executor of the Estate of Merle Kaster of Miles' lack of competence, lack of interest, lack of cooperation, and actual resistance to complet-

ing the work of probating the Estate of Merle Kaster; and

(k) failing to act as a reasonable executor under the circumstances then and there existing.

3. The parties have informed the court that Coulter is now deceased. He passed away between the time he filed his lawsuit against CIGNA and the time of the hearing on the parties' joint motion for partial summary judgment.

M. Barron, Peddicord, Wharton, Thune, and Spencer, P.C., Des Moines, Iowa. Having reviewed the procedural background of this case, the court turns to the standards for summary judgment.

## II. STANDARDS FOR SUMMARY JUDGMENT

The Eighth Circuit Court of Appeals recognizes "that summary judgment is a drastic remedy and must be exercised with extreme care to prevent taking genuine issues of fact away from juries." *Wabun–Inini v. Sessions,* 900 F.2d 1234, 1238 (8th Cir.1990). On the other hand, the Federal Rules of Civil Procedure have authorized for nearly 60 years "motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). Thus, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Wabun–Inini,* 900 F.2d at 1238 (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986)); *Hartnagel v. Norman,* 953 F.2d 394, 396 (8th Cir. 1992).

The standard for granting summary judgment is well established. *Rule* 56 of the Federal Rules of Civil Procedure states in pertinent part:

Rule 56. Summary Judgment

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affi-*

*davits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

*Fed.R.Civ.P.* 56(b) & (c) (emphasis added); *see also Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Reliance Ins. Co. v. Shenandoah South, Inc.,* 81 F.3d 789, 791 (8th Cir.1996); *Beyerbach v. Sears,* 49 F.3d 1324, 1325 (8th Cir.1995); *Munz v. Michael,* 28 F.3d 795, 798 (8th Cir.1994); *Roth v. U.S.S. Great Lakes Fleet, Inc.,* 25 F.3d 707, 708 (8th Cir.1994); *Cole v. Bone,* 993 F.2d 1328, 1331 (8th Cir.1993); *Woodsmith Publishing Co. v. Meredith Corp.,* 904 F.2d 1244, 1247 (8th Cir.1990); *Wabun–Inini,* 900 F.2d at 1238 (citing *Fed.R.Civ.P.* 56(c)).[4] A court considering a motion for summary judgment must view all the facts in the light most favorable to the nonmoving party and give him the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)); *Rifkin v. McDonnell Douglas Corp.,* 78 F.3d 1277, 1280 (8th Cir.1996); *Marts v. Xerox, Inc.,* 77 F.3d 1109, 1112 (8th Cir.1996); *Munz,* 28 F.3d at 796; *Allison v. Flexway Trucking, Inc.,* 28 F.3d 64, 66 (8th Cir.1994); *Johnson v. Group Health Plan, Inc.,* 994 F.2d 543, 545 (8th Cir.1993); *Burk v. Beene,* 948 F.2d 489, 492 (8th Cir.1991); *Coday v. City of Springfield,* 939 F.2d 666, 667 (8th Cir.1991), *cert. denied,* 502 U.S. 1094, 112 S.Ct. 1170, 117 L.Ed.2d 416 (1992).

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for their motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel,* 953 F.2d at 395 (citing *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53; *see also Reed v. Woodruff County, Ark.,* 7 F.3d 808, 810 (8th Cir.

---

4. An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman,* 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986)). "Only disputes over facts

that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Beyerbach,* 49 F.3d at 1326; *Hartnagel,* 953 F.2d at 394.

1993). The moving party is not required by *Rule* 56 to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.*

"When a moving party has carried its burden under *Rule* 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356. The nonmoving party is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Fed. R.Civ.P.* 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *McLaughlin v. Esselte Pendaflex Corp.,* 50 F.3d 507, 511 (8th Cir.1995); *Beyerbach,* 49 F.3d at 1325. Although "direct proof is not required to create a jury question, ... to avoid summary judgment, 'the facts and circumstances relied upon must attain the dignity of substantial evidence and must not be such as merely to create a suspicion.'" *Metge v. Baehler,* 762 F.2d 621, 625 (8th Cir.1985) (quoting *Impro Prods., Inc. v. Herrick,* 715 F.2d 1267, 1272 (8th Cir.1983), *cert. denied,* 465 U.S. 1026, 104 S.Ct. 1282, 79 L.Ed.2d 686 (1984)), *cert. denied sub nom. Metge v. Bankers Trust Co.,* 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986). The necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Allison,* 28 F.3d at 66.

In *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510–11, *Celotex,* 477 U.S. at 323–24, 106 S.Ct. at 2552–53, and *Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1348–56, the Supreme Court established that a summary judgment motion should be interpreted by the trial court to accomplish its purpose of disposing of factually unsupported claims, and the trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Johnson v. Enron Corp.,* 906 F.2d 1234, 1237 (8th Cir.1990). The trial court, therefore, must "assess the adequacy of the nonmovants' response and whether that showing, on admissible evidence, would be sufficient to carry the burden of proof at trial." *Hartnagel,* 953 F.2d at 396 (citing *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552). If the nonmoving party fails to make a sufficient showing of an essential element of a claim with respect to which he has the burden of proof, then the moving party is "entitled to judgment as a matter of law." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552; *Woodsmith,* 904 F.2d at 1247. However, if the court can conclude that a reasonable trier of fact could return a verdict for the nonmovant, then summary judgment should not be granted. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Burk,* 948 F.2d at 492; *Woodsmith,* 904 F.2d at 1247. As stated above, the parties have submitted a joint statement of undisputed facts for the court's consideration as it addresses the issues within the parties' joint motion for summary judgment. Thus, before proceeding to the disposition of the parties' joint motion, the court will first discuss the undisputed factual background preceding this lawsuit.

## III. FACTUAL BACKGROUND

### A. Coulter's Actions Involving The Estates

James Kaster and his mother, Merle Kaster, passed away within a few months of each other in 1980. Eloise Kaster, James' wife, and Susan Kaster, James' daughter, were the sole beneficiaries of the wills of James Kaster and Merle Kaster. Both James and Merle's wills appointed Robert Coulter as executor of both of their wills.[5] Coulter had been a lifelong friend and business associate of James Kaster. In addition to serving as president of Security Savings Bank of Williamsburg, Iowa until 1983 or 1984, Coulter had experience operating insurance agencies and performing real estate duties, was aware of the duties of an executor, and had acted as an executor eight or ten times prior

---

5. Merle Kaster's will specified that Coulter be appointed executor of her estate in the event James Kaster predeceased her.

to James Kaster's death in estates valued as high as $3,000,000. Coulter, as executor of James and Merle's wills, appointed William Miles to serve as attorney for the Kasters' estates. Miles was an attorney practicing in Corydon, Iowa, who also was a controlling shareholder, director, and officer of Corydon State Bank. Miles was James Kaster's attorney and business associate, and he and his law firm also served as attorneys for Corydon State Bank.

At the time of his death, James Kaster and/or his family business, Kaster Insurance, were in debt to Corydon State Bank and Security Savings Bank on two loans of $100,-000.00 and $50,000.00, respectively. James Kaster communicated his testamentary intent to both Coulter and Miles that all of his assets, including the farm property and operations and Kaster Insurance, should be quickly liquidated after his death, and the net cash proceeds should be securely invested for the benefit of Eloise and Susan Kaster. Prior to his death, James Kaster told Coulter that he felt that neither Eloise nor Susan had the ability to operate the insurance agency, manage the farm, or invest in stocks.

James Kaster died testate on August 25, 1980, leaving a gross estate valued at $1,056,-854.13, consisting of Kaster Insurance, farm property and operations, commercial and residential real estate, stocks and bonds, and cash. On August 28, 1980, Eloise Kaster petitioned the probate court to appoint Coulter executor, and Coulter accepted the appointment as executor of James Kaster's estate on that same date by means of Court Officer's Oath and was appointed executor by Letters of Appointment. Coulter filed a Notice of Probate of Will, Notice of Appointment of Executor, and Notice to Creditors on August 28, 1980, with the probate court of Wayne County.

Merle Kaster died testate on December 16, 1980, leaving an estate valued at $195,529.69, consisting of farm property and operations and stocks and bonds. On December 19, 1980, Coulter petitioned the probate court to appoint himself executor, accepted the appointment, and was appointed by Letters of Appointment. On that same date, a Notice of Probate of Will, Notice of Appointment of Executor, and Notice to Creditors were filed with the probate court of Wayne County.

Prior to designating Miles as attorney for the estates of the Kasters, Coulter had never used Miles as an attorney because he neither liked nor respected Miles and had serious questions about his ability and willingness to work on estates. Early in his representation of the Kasters' estates, Miles filed affidavits for compensation for himself as attorney, but not for Coulter as executor. In addition, Coulter never informed Eloise or Susan Kaster of any problems with Miles as attorney for the estates during his tenure as executor or for several years after his resignation.

Coulter and Miles knew that neither Eloise nor Susan Kaster were capable of running the insurance agency or the farm businesses. Coulter both encouraged and acquiesced in the appointment of Susan Kaster to manage the insurance agency, without court approval, even though he knew she was not capable of running it and had not worked in it before James Kaster's death. After James Kaster's death, Eloise and Susan Kaster continued to run the insurance agency against the wishes of James Kaster during the probate of his estate. Eloise Kaster had worked at the insurance agency but did not possess a license to operate the agency.

Beginning in October 1980, Miles began to demand that all the cash income from Kaster Insurance be paid toward the debt of James Kaster and Kaster Insurance to Corydon State Bank, even though no claim for the debt had been filed in the estate. While Coulter was executor, the insurance agency was having financial difficulties because Miles insisted that all money collected by the agency on accounts receivable be paid to Corydon State Bank to satisfy the notes held by the bank. Miles' demands were made with the full knowledge and consent of Coulter. On February 26, 1981, Coulter and Miles caused claims in probate to be filed against James Kaster's estate for the balances of the debts of Kaster and/or Kaster Insurance owed to their respective banks.

On May 1, 1981, the probate court issued a Notice of Delinquency to Coulter for failure

to file the Preliminary Inheritance Tax Report and Probate Inventory for the estate of James Kaster. In response, Coulter filed an Application for Extension of Time to File U.S. Estate Tax Return and/or Pay Estate Tax, requesting that he be allowed until November 25, 1981 to file. In his application, Coulter explained that

a number of the assets in the estate are not yet ascertainable either as to identity or as to value, particularly those which are out of state.... In addition, it has been impossible to date to accurately value the business of the decedent, which business depended on his unique services, and the value of a rather large number of accounts receivable which must all be pursued to determine worth.... Decedent had a large amount of debt which consumed the rather small amount of liquidity with past due debt remaining. Therefore, either or both of the major assets in the estate, being the one man business or a farm, must be sold to pay the tax. It cannot yet be ascertained whether the business is even salable without decedent's services and the farm land is tied up with tenancies so that sale cannot be completed and proceeds, sufficient to pay tax, obtained until March or April of 1982.

(Joint Statement of Facts, Exh. 21.).

In June 1981, James Kaster's estate acquired a cash inheritance from the estate of James' aunt, Fay Bailey, in the amount of $92,045.94. Coulter used $51,464.71 of this inherited money to satisfy his bank's claim against James Kaster's estate and $15,000.00 of the inheritance to pay on the claim of Miles' bank against the estate, making both payments on June 23, 1981. Coulter paid on the Corydon State Bank claim from the Fay Bailey estate, even though he knew that Kaster Insurance Agency needed the money at that time. Eloise and Susan Kaster trusted Coulter; therefore, they did not perceive Coulter and Miles' simultaneous roles as fiduciaries of the estates and as bankers/creditors of the estate as constituting conflicts of interest.

On July 2, 1981, Coulter resigned as executor of James Kaster's estate, and on July 9, 1981, resigned as executor of Merle Kaster's estate as well. In his resignation papers, Coulter claimed that "said executor has administered and collected the assets of said decedent, has filed for and received an extension of time for the filing of the Federal Estate Tax Return, and has generally complied with all of the duties and responsibilities as a personal representative of the estate." (Joint Statement of Facts, Exh. 24, ¶ 5.). Prior to his resignation, on July 1, 1981, Coulter obtained the signatures of Eloise and Susan Kaster on forms entitled "Waiver of Notice and Accounting and Consent." With Miles' assistance, Coulter withheld from Eloise Kaster payment of her widow's allowance from the estate of James Kaster from June 22, 1981 until after his resignation on July 2, 1981.

As of the date of Coulter's resignation, no appraisals had been conducted on any asset of the estates of either James or Merle Kaster, including the sole out-of-state asset of James' estate, which was a house held in joint tenancy with Eloise in Arizona, the farms and other real estate, and Kaster Insurance Agency. In addition, none of the farmland in either estate was ever listed for sale with a real estate broker or agency during Coulter's tenure as executor. In fact, Coulter had made no attempts to list any asset of either estate for sale. Coulter had also failed to give notice to farm tenants of lease termination and had not made any serious attempts to collect the accounts receivable of Kaster Insurance. Coulter admitted that failure to sell the farmland during his tenure "could have been my error that I didn't want to bring it to a head that early." (Joint Statement of Facts, Exh. 1, p. 125.).

Coulter admitted that Kaster Insurance Agency was never listed for sale with any type of broker and that neither he nor Miles had ever employed anyone to make an evaluation of the insurance business to determine a fair price for its sale. When asked in his deposition whether Miles was the one who was blocking the sales of estate assets, Coulter replied, "I don't know. I never tried." (Joint Statement of Facts, Exh. 1, p. 85.). Coulter did acknowledge that someone showed interest in purchasing Kaster Insurance for $200,000.00. However, he did not

feel the offer was adequate; thus, the sale did not take place.

In addition, Coulter admitted in his deposition that he was aware of a potential buyer for the James Kaster farm. A tentative offer was made by an adjoining landowner of $1,450.00 per acre for the 240–acre parcel; however, Coulter and the potential buyer never got to the point where a firm offer was made or a deal was struck because the buyer purchased Coulter's wife's family farm instead. Coulter also testified in his deposition that some of the assets listed in the probate inventory of the James Kaster estate could have been converted to cash and invested in new treasury notes at an interest rate of twelve and one-half percent at that time. The cash proceeds of James Kaster's inheritance from Fay Bailey were not utilized to pay estate and inheritance taxes. Instead, Miles, with the grudging assistance of Susan Kaster, the executor of Merle Kaster's estate, mortgaged the unencumbered Merle Kaster farm on May 28, 1982, to pay the taxes of the James Kaster estate. This action began the commingling of these two estates, and it would take more than a decade to unravel them.

## B. Eloise And Susan Kaster As Executors

Coulter secured the appointment of Eloise Kaster as successor executor of James Kaster's estate and Susan Kaster as successor executor of Merle Kaster's estate, even though neither of them had ever served as executor of an estate. James Kaster had not wanted these two women burdened with the business of the estate; thus, he wanted everything sold and reduced to cash upon his death. Susan Kaster did not know how to balance a checkbook, and Coulter considered Eloise Kaster to be "stupid, stupid, stupid." Coulter testified at his deposition that prior to James Kaster's death, neither Eloise nor Susan Kaster ever got involved in handling the family money or finances. In addition, neither Eloise nor Susan Kaster really understood the various businesses or their financial aspects. Coulter also testified that at the time of his resignation, he knew that "[t]he value was going down every day in the

land, in the insurance agency, etc. . . . ." (Joint Statement of Facts, Exh. 1, p. 100.).

Neither Coulter nor Miles gave either Eloise or Susan any instruction or direction as to how to function as executors of estates, nor did they inform the Kasters of the propriety or impropriety of what they had or had not done in the probate of the estates up to the point of Coulter's resignation. Coulter testified that he could not recall that he spoke much with either Eloise or Susan Kaster about the status of the estates after he resigned as executor. Coulter did state that he never discussed with Eloise or Susan the possibility of replacing Miles as attorney of the estates and never advised them that they had a right to terminate Miles and replace him. In 1983, Eloise and Susan Kaster purchased a brass elephant for Miles' collection to show their appreciation for what they believed he was doing for the estates of James and Merle Kaster.

In 1989, Eloise and Susan Kaster called Coulter because they were concerned that Miles might not be doing his job as attorney for the estates. Coulter contacted Judge Thomas Bown, who helped the women find other counsel to investigate the matter. When Eloise and Susan Kaster realized the estates of James and Merle Kaster should have closed a long time ago, Coulter encouraged them to sue Miles as the one who had caused the problem with the estates. Miles had continued to drain money from the Kaster estates for the benefit of his bank and did not take any meaningful steps toward closing the estates during the 1980s, until he was compelled to withdraw as attorney for the estates, and Don Clark of Creston, Iowa, was appointed by the probate court on January 3, 1991. Miles did not file fiduciary tax returns for the years 1981 through 1989.

Susan and Eloise Kaster served as successor executors of the estates of Merle and James Kaster, respectively, from January of 1991 until July 30, 1993. After Coulter resigned as executor of the estates, delinquency notices were sent to Eloise Kaster as executor of James Kaster's estate in July of 1981, April of 1984, November of 1985, and October of 1990. Delinquency notices were mailed to Susan Kaster as executor of Merle

Kaster's estate in April of 1984, April of 1985, and October of 1990. Miles obtained extensions after each delinquency notice by means of applications which were signed only by him and were never presented to either Eloise or Susan Kaster.

Don Clark completed the work of both estates on July 30, 1993. The net value of the James Kaster estate was originally $634,-027.69 and had fallen to $207,900.00 during the time of its probate. Likewise, the net value of the Merle Kaster Estate fell from $168,609.85 to $5,833.57 during the time of its probate. During the same years, interest rates for the government securities James Kaster had wanted Coulter and Miles to purchase with the liquidated assets of his estate had plummeted. Coulter blamed Miles for the failure to liquidate the estates' assets and for the failure to complete the probate of the estates. According to Eloise and Susan Kaster, they did not suspect that any action by Coulter, as one-time executor of the estates, had contributed to any problem in probating the estates. Furthermore, the Kasters claim they did not learn of Coulter's negative attitude toward them until they were present at a deposition of Judge Tom Bown and until they had read the deposition of Coulter, both taken in 1993 in the malpractice case the Kasters brought against Miles. On June 6, 1994, Eloise and Susan Kaster brought suit against Coulter.

### C. Coulter's Insurance Policy

Coulter had a homeowners/general liability insurance policy issued by INA/CIGNA for the period of October 31, 1980, through October 31, 1982, which provided "occurrence" coverage, not "claims made" coverage. With regard to liability coverage, the policy provided

> YOUR LIABILITY CLAIMS COVERAGE
>
> Your Homeowner's Policy will pay on your behalf if someone brings a liability claim against you for bodily injury or property damage for which you are liable.
>
> What do we mean by liability claims? Claims in which someone says you are legally responsible.

What do we mean by bodily injury? Any physical harm, sickness or disease including any care that is required, or any services that are lost or death that results from the bodily injury.

> What do we mean by property damage? Any physical damage or destruction to tangible property, including the loss of the use of that property.

(Joint Statement of Facts, Exh. 35.). In addition, the policy contained an exclusion for "intentional loss," which provided that CIGNA "w[ould] not protect any person from claims for bodily injury or property damage if that person expected or intended the injury or damage." (Joint Statement of Facts, Exh. 35.).

The policy provided a limit of coverage of $100,000.00 per occurrence and stated that the amount of $100,000 was the maximum amount that CIGNA would pay "for any one accident or occurrence, including continuous or repeated exposure to the same event." (Joint Statement of Facts, Exh. 35.). Under the policy provision defining "loss of use," the policy provides that

> [y]ou may no longer be able to use your home or your grounds because of a loss covered under this policy. On your summary of coverages page you will find a maximum amount we will pay for "Loss of use." This is the most we will pay for all losses of use resulting from any covered accident or event, including continuous or repeated exposure to the same hazard.

(Joint Statement of Facts, Exh. 35, p. 7.). Having reviewed the stipulated factual background of this case, the court proceeds to the disposition of the parties' joint motion for partial summary judgment.

### IV. LEGAL ANALYSIS

The parties agree that upon consideration of the stipulated facts, the following issues can be determined by the court. The parties are in apparent agreement that the primary issue is whether the CIGNA homeowners/general liability insurance policy provides coverage to Coulter in the underlying lawsuit if the damages alleged in the underlying lawsuit do not constitute "physical damage or destruction to tangible property, in-

cluding the loss of the use to that property." The parties, however, dispute the language defining "property damage." Coulter claims the policy provides coverage for loss of use of tangible property, irrespective of physical damage. CIGNA, on the other hand, argues that Coulter's policy provides coverage for loss of use of tangible property, but only where that property has been "physically damaged or destroyed." Even if coverage under the policy for loss of use of tangible property is found not to be contingent on the existence of physical damage or destruction, CIGNA maintains that the petition in the underlying lawsuit fails to allege a loss of use of tangible property.

Among the additional issues raised by the parties in their motions, CIGNA claims the underlying lawsuit fails to allege an "occurrence" or "accident," as defined by Iowa law. CIGNA asserts that an occurrence is generally defined as an accident, which results in property damage that is neither expected nor intended by the insured. Thus, CIGNA argues that because Coulter expected or intended the damage to James and Merle Kaster's estates, there is no occurrence under the policy to trigger coverage. Coulter maintains that although he acted in his own best interests while serving as executor, he did not intend to injure the estates or the beneficiaries, nor did he recognize a substan-

tial probability that his actions would result in such injury.

CIGNA also argues that the Kasters' claims against Coulter in the underlying suit are time-barred under Iowa Code § 614.1(4);[6] therefore, Coulter cannot recover on his claim against CIGNA for failure to provide insurance coverage. Coulter, however, contends that any one of three exceptions apply to allow these claims in spite of the statute of limitations, namely, the discovery rule, fraudulent concealment, and the doctrine of equitable estoppel. CIGNA also asserts that at the time of Coulter's resignation as executor of James and Merle Kaster's estates, the Kasters released Coulter "from all liability which he may have incurred during his term" and consented to his discharge without liability. Coulter contends the Kasters' overwhelming ignorance of both Coulter's conduct and of the tasks they needed to accomplish in general as executors of the estates indicate that they did not have knowledge of all the material facts to make a knowing waiver of their rights against Coulter.

■ Having discussed the general issues and arguments raised by the parties in their joint motion for partial summary judgment,[7] the court turns to an analysis of the first issue: whether the damages suffered by James and Merle Kaster's estates are covered under Coulter's policy with CIGNA as

**6.** Iowa Code § 614.1 provides that

Actions may be brought within the times herein limited, respectively, after their causes accrue, and not afterwards, except when otherwise specially declared:

.    .    .    .    .

4. Unwritten contracts—injuries to property—fraud—other actions. Those founded on unwritten contracts, those brought for injuries to property, or for relief on the ground of fraud in cases heretofore solely cognizable in a court of chancery, and all other actions not otherwise provided for in this respect, within five years, except as provided by subsections eight and ten.

**7.** Although the issue has not been raised by either Coulter or CIGNA, the court has grave doubts as to whether Coulter is the "real party in interest," or in other words, the proper party to bring this action against CIGNA. The court assumes that CIGNA did not raise this issue because at the hearing on this motion, Coulter's

attorney indicated that he would be filing an amendment to address the substitution of the Kasters as plaintiffs in this action. The court, however, has reviewed the record, and no amendment has been filed.

Under Iowa law, if a party makes a full and complete assignment of his rights under a contract, the assignee, rather than the assignor, is the proper party to maintain the cause of action. See *Estate of Dyer v. Krug*, 533 N.W.2d 221, 224 (Iowa 1995) (citing *Archibald v. Midwest Paper Stock Co.*, 158 N.W.2d 739, 742 (Iowa 1968)). Because Coulter assigned all of his rights under the CIGNA policy to the Kasters, arguably the Kasters are the proper parties to maintain the cause of action against CIGNA. However, the Eighth Circuit has held that the real party in interest defense is waived if not timely asserted, see *Lucas v. Lucas*, 946 F.2d 1318, 1323 (8th Cir.1991), and as mentioned, this issue has not been raised by CIGNA. Although the court has recognized this issue, I will not raise it *sua sponte*.

"property damage." Before addressing that issue, however, the court will first examine the case law involving general insurance principles, including the insurer's duty to defend and the rules involving the interpretation of an insurance policy.

### A. General Insurance Principles

#### 1. Insurer's duty to defend

Coulter maintains that CIGNA had a duty to defend him in the underlying lawsuit against the Kasters' claims, in that their claims were covered under his homeowners/general liability insurance policy. Despite Coulter's repeated attempts to request CIGNA's presentation of a defense in the underlying lawsuit, including soliciting CIGNA's participation in settlement negotiations with the Kasters, CIGNA refused to launch a defense on behalf of Coulter or take part in any settlement negotiations involving the Kasters' claims. In reference to its lack of action involving the underlying lawsuit, CIGNA argues it had no duty to defend Coulter in the underlying lawsuit with the Kasters, in part, because the damages alleged in the underlying lawsuit did not constitute "physical damage or destruction to tangible property, including the loss of the use of that property." Because the general argument involves the question of whether CIGNA had a duty to defend its insured, Robert Coulter, the court will examine Iowa law regarding this duty placed upon an insurer.

■ An insurer has a duty to defend whenever there is potential or possible liability to indemnify the insured based upon the facts appearing at the outset of the case. *First Newton Nat'l Bank v. General Casualty Co. of Wis.*, 426 N.W.2d 618, 623 (Iowa 1988) (citing *McAndrews v. Farm Bureau Mut. Ins. Co.*, 349 N.W.2d 117, 119 (Iowa 1984)); *see also Yegge v. Integrity Mut. Ins. Co.*, 534 N.W.2d 100, 102 (Iowa 1995) (duty to defend whenever potential liability to indemnify based upon facts appearing at outset of the case; however, duty to defend and duty to indemnify are co-extensive duties in that there is no duty to defend unless there is a duty to indemnify); *Essex Ins. Co. v. Fieldhouse, Inc.*, 506 N.W.2d 772, 774 (Iowa 1993)

(in analyzing the potential duty to defend, which is broader than the duty to indemnify, the appropriate starting point is the allegations contained in the petition); *Weber v. IMT Ins. Co.*, 462 N.W.2d 283, 285 (Iowa 1990); *Kartridg Pak Co. v. Travelers Indem. Co.*, 425 N.W.2d 687, 688 (Iowa Ct.App.1988) (to determine whether insurer had duty to defend, court construes the policy and looks to the pleadings and all other admissible and relevant facts in the record to determine whether coverage exists under the policy). Although courts should look first and primarily to the petition for the "facts at the outset of the case," it is sometimes necessary to expand the scope of inquiry to any other admissible and relevant facts in the record. *First Newton Nat'l Bank*, 426 N.W.2d at 623 (citing *McAndrews*, 349 N.W.2d at 119).

■ On the other hand, an insurer is not required to provide a defense when no facts presently available to it indicate coverage of the claim, merely because such facts might later be added by amendment or introduced as evidence at the trial. *McAndrews v. Farm Bureau Mut. Ins. Co.*, 349 N.W.2d 117, 119 (Iowa 1984). Furthermore, "[t]he insurer has no duty to defend if after construing both the policy in question, the pleadings of the injured party and any other admissible and relevant facts in the record, it appears the claim made is not covered by the indemnity insurance contract." *Weber*, 462 N.W.2d at 285 (quoting *McAndrews*, 349 N.W.2d at 119, in turn, citing *Central Bearings Co. v. Wolverine Ins. Co.*, 179 N.W.2d 443, 445 (Iowa 1970)). If the totality of facts fail to disclose potential coverage, an insurer might proceed in two ways: it could initiate a declaratory judgment action against its insured, or it might elect to do nothing, running the risk, of course, that its insured will seek indemnity if coverage is established at trial. *McAndrews*, 349 N.W.2d at 119 (citations omitted).

#### 2. Ambiguity of terms in an insurance policy

Because the issue of CIGNA's duty to defend Coulter in the underlying lawsuit requires, in part, an analysis of whether the claims in the underlying lawsuit involve

"property damage," as defined Coulter's insurance policy; the court must determine whether the definition of "property damage" is ambiguous as it is worded in the policy. The question of whether any term in an insurance policy is ambiguous must be determined by the standards for determination of the ambiguity of terms in an insurance contract. The court therefore turns to identification of those standards for determining ambiguity.

Those standards were recently summarized by the Iowa Supreme Court in *Morgan v. American Family Mut. Ins. Co.*, 534 N.W.2d 92 (Iowa 1995):

> The construction and interpretation of an insurance policy is a question of law for the court to decide. *Johnson v. Farm Bureau Mut. Ins. Co.*, 533 N.W.2d 203, 206 (Iowa 1995). The policy is to be construed as a whole, giving the words used their ordinary, not technical meaning to achieve a practical and fair interpretation. *Gracey v. Heritage Mut. Ins. Co.*, 518 N.W.2d 372, 373 (Iowa 1994). When the terms of an insurance policy are ambiguous, we will construe them against the insurer. *Id.* However, the mere fact that the parties disagree on the meaning of a particular term does not establish ambiguity. *Id.* We will not give a strained or unnatural reading to the words of the policy to create ambiguity where there is none. *West Trucking Line, Inc. v. Northland Ins. Co.*, 459 N.W.2d 262, 263 (Iowa 1990).

*Morgan,* 534 N.W.2d at 99. The standards stated in *Morgan* are mirrored in myriad decisions by Iowa courts. *See, e.g., AMCO Ins. Co. v. Rossman,* 518 N.W.2d 333, 334 (Iowa 1994) (terms given ordinary meaning as reasonable person would understand them, and disagreement between parties over meaning does not establish ambiguity); *Farm Bureau Mut. Ins. Co. v. Sandbulte,* 302 N.W.2d 104, 108 (Iowa 1981) (disagreement between parties as to meaning does not establish ambiguity); *Pappas v. Bever,* 219 N.W.2d 720, 721 (Iowa 1974) (terms must be given their plain and ordinary meanings); *Tom Riley Law Firm, P.C. v. Tang,* 521 N.W.2d 758, 759 (Iowa Ct.App.1994) (disagreement of parties as to meaning does not

establish ambiguity, citing *Sandbulte,* and terms must be given their ordinary meaning, citing *Pappas* ).

■ To the standards stated in *Morgan* must be added only a few further points on determinations of ambiguities in insurance contracts. Under Iowa contract law, " 'ambiguity exists if, after the application of pertinent rules of interpretation to the policy words, a genuine uncertainty exists as to which of two or more meanings is the proper one.' " *Jensen v. Jefferson County Mut. Ins. Ass'n,* 510 N.W.2d 870, 871 (Iowa 1994) (quoting *Connie's Constr. Co., Inc. v. Fireman's Fund Ins. Co.,* 227 N.W.2d 207, 210 (Iowa 1975)); *Motor Club of Iowa Ins. Co. v. Iowa Mut. Ins. Co.,* 508 N.W.2d 634, 636 (Iowa 1993); *A.Y. McDonald Indus., Inc. v. Insurance Co. of N. Am.,* 475 N.W.2d 607, 619 (Iowa 1991); *Iowa Fuel & Minerals v. Board of Regents,* 471 N.W.2d 859, 863 (Iowa 1991); *West Trucking Line, Inc.,* 459 N.W.2d at 263; *Nepstad Custom Homes Co. v. Krull,* 527 N.W.2d 402, 405 (Iowa Ct.App.1994) (citing *Iowa Fuel & Minerals* ); *Tom Riley Law Firm, P.C.,* 521 N.W.2d at 759 (ambiguity exists when a genuine uncertainty exists over two or more meanings of the terms of the contract). The test for ambiguity is an objective one: "Is the language fairly susceptible to two interpretations?" *Met–Coil Sys. Corp. v. Columbia Casualty Co.,* 524 N.W.2d 650, 658 (Iowa 1994) (citing *North Star Mut. Ins. Co. v. Holty,* 402 N.W.2d 452, 454 (Iowa 1987)); *Cincinnati Ins. Co. v. Hopkins Sporting Goods, Inc.,* 522 N.W.2d 837, 839 (Iowa 1994) (same standard); *Gracey,* 518 N.W.2d at 373 (posing same question); *Iowa Fuel,* 471 N.W.2d at 863 (citing *Central Bearings Co.,* 179 N.W.2d at 445); *North Star Mut. Ins. Co. v. Holty,* 402 N.W.2d 452, 454 (Iowa 1987) (same standard); *Sandbulte,* 302 N.W.2d at 108 (posing same question); *see also Farm & City Ins. Co. v. Anderson,* 509 N.W.2d 487, 491 (Iowa 1993) (formulating the test for ambiguity in an insurance policy as "whether a reasonable person would read more than one meaning into the words," citing *Smithway Motor Xpress, Inc. v. Liberty Mut. Ins. Co.,* 484 N.W.2d 192, 194 (Iowa 1992)).

■ To add further emphasis to a point made in *Morgan*, it is a "fundamental rule" for interpreting insurance contracts that they must be construed in the light most favorable to the insured. *Cincinnati Ins. Co.*, 522 N.W.2d at 839; *AMCO Ins. Co.*, 518 N.W.2d at 334 ("When the meaning of terms of an insurance policy is susceptible to two interpretations, the one favoring the insured is adopted."); *Jensen*, 510 N.W.2d at 871; *A.Y. McDonald Indus., Inc.*, 475 N.W.2d at 619; *North Star Mut. Ins. Co.*, 402 N.W.2d at 454; *Rich v. Dyna Technology, Inc.*, 204 N.W.2d 867, 872 (Iowa 1973) ("Where insurance contracts are ambiguous, require interpretation, or are susceptible to equally proper constructions, the court will adopt the construction most favorable to the insured."); *The Travelers v. Mays*, 434 N.W.2d 133, 134 (Iowa Ct.App.1988) (quoting *Rich*). The reason for this rule is that insurance contracts are contracts of adhesion. *Cincinnati Ins. Co.*, 522 N.W.2d at 839; *Jensen*, 510 N.W.2d at 871; *A.Y. McDonald Indus., Inc.*, 475 N.W.2d at 619. However, this rule applies only when the terms of the policy are ambiguous or unclear. *Farm & City Ins. Co.*, 509 N.W.2d at 490–91.

■ Although interpreting the meaning of words in an insurance policy is most often an issue of law for the court to decide, the interpretation becomes a question of fact where the interpretation depends on "extrinsic evidence or on a choice among reasonable inferences from extrinsic evidence." *Jensen*, 510 N.W.2d at 871; *Grinnell Mut. Reinsurance Co. v. Voeltz*, 431 N.W.2d 783, 785 (Iowa 1988). Extrinsic evidence refers to evidence other than the words of the policy. *Id.*; *Voeltz*, 431 N.W.2d at 785. When interpreting insurance policies, the court must " 'seek to ascertain from its words the intent of the insurer and insured at the time the policy was sold.' " *Id.* (quoting *Voeltz*, 431 N.W.2d at 785).

Thus, in analyzing the definition of "property damage" as it reads in the policy, the question the court must resolve is, therefore, "Are the terms of the policy susceptible to two or more meanings?" With this question in mind, the court proceeds to an analysis of the parties' arguments regarding the definition of "property damage" and whether CIGNA had a duty to defend Coulter in the underlying lawsuit against the Kasters' claims of negligence and breach of fiduciary duty.

## B. "Property Damage" Under The CIGNA Policy

■ In Coulter's homeowners liability policy with CIGNA, the pertinent liability coverage provision provides coverage for "property damage," which is defined as *"[a]ny physical damage or destruction to tangible property, including the loss of the use of that property."* As mentioned, Coulter claims the damages alleged in the underlying lawsuit constitute "property damage" and are covered under his policy with CIGNA. All the damages alleged in the underlying lawsuit between Coulter and the Kasters were claimed to be the result of Coulter's actions as executor of the estates of James and Merle Kaster. The damages took the form of alleged economic loss and diminution of value of the assets of the estates.

Regarding the language within the "property damage" definition in Coulter's policy, CIGNA contends the reference to "that property" in the phrase, "including the loss of use of that property," refers to "the property that was physically damaged or destroyed." CIGNA argues that no allegation was made in the underlying lawsuit and there is no evidence to suggest that any "tangible property" was "physically damaged." Therefore, it argues that there is no covered "property damage" as that term is defined in the policy. CIGNA cites two Iowa cases discussing similar clauses in insurance policies and addressing the requirement of "physical damage" in those clauses: *Kartridg Pak Co. v. Travelers Indem. Co.*, 425 N.W.2d 687 (Iowa Ct.App. 1988) and *Yegge v. Integrity Mut. Ins. Co.*, 534 N.W.2d 100 (Iowa 1995). Coulter argues these cases do not apply to the situation at hand and cites *American Home Assur. Co. v. Libbey–Owens–Ford Co.*, 786 F.2d 22 (1st Cir.1986) in support of his arguments on this issue. The court will begin its analysis of the definition of "property damage" and whether the claims in the underlying lawsuit fit within this definition to trigger coverage under

Coulter's homeowners/general liability policy by looking at the applicable law in Iowa and at analogous cases in other states and in other jurisdictions.

### 1. Requirement of physical damage or destruction

#### a. Iowa law

Under Iowa law, there is no case precisely on point addressing the issue raised by the parties regarding the requirement of physical damage in the instance where the damages claimed are primarily damages resulting from diminution in value and economic loss. However, the court recognizes that there are some similar cases in Iowa, which have been cited by the parties, in which the Iowa Supreme Court and the Iowa Court of Appeals have discussed the requirement of physical damage in provisions in insurance policies pertaining to property damage.

The most recent Iowa case addressing a similar situation is *Yegge v. Integrity Mut. Ins. Co.*, 534 N.W.2d 100, 102 (Iowa 1995). In *Yegge*, an insurer, having provided a general business liability policy to a building contractor, was sued by homeowners in a dispute arising from construction of a residence. *Yegge*, 534 N.W.2d at 101. The underlying lawsuit alleged damages resulting from breach of contract, breach of express and implied warranty, negligence, and fraud against a builder. *Id.* at 102. The homeowners sought damages for cost of labor, material, and supplies necessary to complete their residence to their satisfaction, disruption of their lives, impairment of their business, increased expenses, diminished investment value, and emotional distress. *Id.* The insurer refused to defend its insured, the contractor, in the underlying lawsuit, determining that because it had no duty to indemnify on the homeowners' claims, it had no duty to defend. *Id.* at 101. The general business liability policy provided coverage for "property damage" caused by an "occurrence," as defined by the policy. According to the policy, "property damage" is

(1) Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be

deemed to occur at the time of the physical injury that caused it; or

(2) Loss of use of tangible property that is not physically injured.

*Id.* at 102. The Iowa Supreme Court found that the subjects of the counts in the underlying lawsuit were intangible economic losses; as such, these losses did not qualify as "property damage," apparently under either definition provided in the policy. *Id.* (citing *Kartridg Pak Co. v. Traveler's Indem. Co.*, 425 N.W.2d 687, 690 (Iowa Ct.App.1988) ("intangible damages, such as diminution in value, do not constitute physical injury to or destruction of tangible property"). The court found that the underlying lawsuit was, "from beginning to end, a claim for poor performance in constructing a residence. [The homeowners] would convert a routine business liability policy into a performance bond, clearly a risk [the insurer] did not undertake." *Id.* at 103.

In concluding that the policy in *Yegge* failed to cover the intangible losses asserted by the homeowners, the Iowa Supreme Court cited the Iowa Court of Appeals in *Kartridg Pak Co. v. Travelers Indem. Co.*, 425 N.W.2d 687 (Iowa Ct.App.1988) for the proposition that intangible losses did not constitute "physical injury to or destruction of tangible property." *See Yegge*, 534 N.W.2d at 102 (citing *Kartridg Pak Co.*, 425 N.W.2d at 690). In *Kartridg Pak Co.*, an insurer claimed it did have a duty to defend its insured, Kartridg Pak Company ("Kartridg Pak"), in a lawsuit filed by Iowa Meat Fabricators, Inc. ("Iowa Meat"), in that its general liability policy did not provide coverage for any of the claims asserted by Iowa Meat in the underlying lawsuit. *Kartridg Pak Co.*, 425 N.W.2d at 688. In the underlying lawsuit, Iowa Meat asserted claims of breach of contract and breach of express and implied warranties against Kartridg Pak. *Id.* at 689. Specifically, Iowa Meat alleged that a mechanical deboner, which it leased from Kartridg Pak, did not perform as promised, resulting in diminished value of meat. *Id.* Kartridg Pak contended that the diminished value of the meat created the requisite "property damage" under the policy, and thus, its insurer had an obligation to defend Kartridg Pak in

the underlying lawsuit. *Id.* The general liability policy provided the following definition of "property damage":

(1) [P]hysical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) [L]oss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

*Id.*

The Iowa Court of Appeals found this alleged diminution in value did not constitute "property damage," and noted that "although the failure to sufficiently separate the meat and bone allegedly diminished the value of the backbones, it did not physically injure the product. Thus, this failure cannot support coverage for damages allegedly caused by it." *Kartridg Pak Co.*, 425 N.W.2d at 690. In reaching this conclusion, the court noted that other courts have found that intangible losses, such as loss of use or diminution of value, are "property damage;" however, those decisions had interpreted policy language defining "property damage" as "injury to tangible property," rather than "physical injury to tangible property." *Id.* at 689 (quoting *American Home Assur. Co. v. Libbey–Owens–Ford Co.*, 786 F.2d 22, 25 (1st Cir.1986) (citations omitted)). Where courts have interpreted "more recent policies in which property damage is defined as 'physical' injury to tangible property, such courts have held that intangible damages, such as diminution in value, are not considered property damage." *Id.* (quoting *American Home Assur. Co.*, 786 F.2d at 25, in turn, citing *Wyoming Sawmills, Inc. v. Transportation Ins. Co.*, 282 Or. 401, 578 P.2d 1253 (1978), and *Federated Mut. Ins. Co. v. Concrete Units, Inc.*, 363 N.W.2d 751, 757 (Minn.1985)). The Iowa Court of Appeals further recognized that

the critical difference in policy language is the result of a 1973 revision of the Comprehensive Liability Policy, used by most insurance companies, which expressly added the modifier "physical" injury to the definition of "property damage" in order to restrict recovery for intangible losses.... Under this policy language, some physical injury to tangible property must be shown in order to trigger coverage.

*Kartridg Pak Co.*, 425 N.W.2d at 689 (quoting *American Home Assur. Co.*, 786 F.2d at 25). The court determined the policy in that case reflects "this change in the definition of property damage" and found that the requirement in that policy of "physical injury to or destruction to tangible property" was clear and unambiguous. *Id.* at 690. In summary, the court concluded that intangible losses, such as diminution in value, do not constitute physical injury to or destruction of tangible property; thus, the insurer did not have a duty to defend. *Id.*

Upon analyzing those two Iowa cases, it is apparent that the clause defining "property damage" in the CIGNA policy is similar to those clauses in *Yegge* and *Kartridg Pak* in that the CIGNA policy defines "property damage," in part, as "physical damage or destruction to tangible property." Both *Yegge* and *Kartridg Pak* indicate that property damage may be defined as physical injury, damage, or destruction to tangible property. In addition, where the definition of property damage includes the modifier "physical" before injury, damage, or destruction, the Iowa courts have found that "physical" damage, injury, or destruction to tangible property is required in order to trigger coverage under an insurance policy and an insurer's duty to defend. *See Kartridg Pak Co.*, 425 N.W.2d at 690 (intangible losses, such as diminution in value, do not constitute physical injury to or destruction of tangible property); *cf. Yegge*, 534 N.W.2d at 102 (intangible economic losses did not qualify as "property damage," apparently under definition requiring "physical" injury to tangible property or under definition requiring loss of use of tangible property that is not physically injured). Conversely, where the policy in question defined "property damage" either in sum or in part without the modifier "physical" before damage, injury, or destruction, Iowa courts have recognized insurance coverage for loss of use of tangible property that was not physically damaged. *See, e.g., Ellsworth–William Coop. Co. v. United Fire &*

*Casualty Co.*, 478 N.W.2d 77, 81–82 (Iowa Ct.App.1991) (loss of use of undamaged grain bins was covered loss of use of tangible property where definition of property damage included "loss of use of tangible property which has not been physically injured or destroyed...."); *First Newton Nat'l Bank v. General Casualty Co. of Wis.*, 426 N.W.2d 618, 626–27 (Iowa 1988) (where multi-peril policy provided two alternative definitions of property damage, one of which required "loss of use of tangible property which has not been physically injured or destroyed ...," and umbrella policy defined "property damage" as an "injury to or destruction of tangible property," loss of property and loss of profits from farming operations sufficed to meet the required definitions of "property damage" under both policies in order to trigger coverage).

However, the question in this case revolves around the latter portion of the sentence defining "property damage" in the CIGNA policy. The CIGNA policy defines "property damage" as "physical damage or destruction to tangible property, *including the loss of the use of that property.*" (emphasis added). Coulter argues this definition lends the interpretation of "property damage" as "loss of use of tangible property," irrespective of physical damage or destruction. CIGNA, on the other hand, contends that the only interpretation of this definition is that "property damage" is "loss of use of tangible property that is physically damaged or destroyed." In other words, CIGNA asserts that the policy provides coverage for damages for the loss of use of tangible property arising out of physical injury to that tangible property. To examine this issue, which has not been directly addressed by the Iowa courts, the court turns to an examination of case law in other jurisdictions to interpret the latter portion of the clause in question.

#### b. Other jurisdictions

Coulter argues that property damage, as defined in CIGNA's policy, can be defined as loss of use of tangible property and that there is nothing in the definition that requires physical damage or destruction to accompany that loss of use. In the few deci-

sions that have addressed the requirement of physical damage or destruction in this context, courts differ in their interpretation of similar clauses defining "property damage."

*i. Ehlers and Dixon.* One line of reasoning construes the inclusion of the adjective "physical" in describing "damage or destruction to tangible property, including loss of use ..." as requiring physical damage but permitting damages for the loss of use to tangible property arising out of the physical damage. In *Ehlers v. Johnson*, 476 N.W.2d 291 (Wis.Ct.App.1991), the insureds were accused of misrepresenting the lot lines in the sale of their lake property, and they brought a third-party claim against the insurer with whom they had a homeowners liability policy. *Ehlers*, 476 N.W.2d at 292. Their homeowners policy defined "property damage" as "physical injury to or destruction of tangible property, including the loss of use of *this* property." *Id.* (emphasis added). The insureds in *Ehlers* made virtually the same argument as Coulter has made in this case, and the Wisconsin Court of Appeals rejected the argument that the alleged diminution in market value, as well as use value to the Ehlers, constituted "property damage," as defined in their homeowners policy. *Id.* at 293. The court noted that the plaintiffs would interpret the clause "including the loss of use of this property" to mean all tangible property, not just physically injured or destroyed property. *Id.* The court disagreed, finding that

the clause "including loss of use of this property" is unambiguous. The only reasonable meaning of the clause is that it defines property damage to include loss of use damage that accompanies physical injury or destruction....

The loss of use clause is introduced by the verb "including." the dictionary defines "including" as "to take in or comprise as part of a whole...." The Merriam Webster Dictionary 358 (1974). The loss of use clause is thus introduced as a subset of "physical injury to or physical destruction of tangible property." If the loss of use clause were interpreted as the [insureds] would have it, i.e., as any nonphysical injury to tangible property, the definition of

property damage would effectively read: "physical injury to ... tangible property, including non-physical injury." We reject such a contradictory reading.

*Id.* (citing *Dixon v. National Amer. Ins. Co*, 411 N.W.2d 32 (Minn.Ct.App.1987)).

The Minnesota Court of Appeals reached the same conclusion from identical policy language in *Dixon v. National Amer. Ins. Co*, 411 N.W.2d 32 (Minn.Ct.App.1987). In *Dixon*, the buyers of the insureds' home filed a lawsuit against the insureds, alleging that the well and septic system for the home were inadequate and that the septic system was outside the property's boundaries. *Dixon*, 411 N.W.2d at 33. The insureds had a homeowners policy and brought an action seeking a declaration that their insurer had an obligation to defend and indemnify them under the policy. *Id.* In their suit against their insurer, the insureds asserted that the buyers' cause of action was for "property damage," which was defined in their homeowners policy as "physical injury to or destruction of tangible property, including the loss of use of this property." *Id.* The Minnesota Court of Appeals found the buyers' claim was not for "property damage," noting that

> [there] is no allegation that the property was injured or damaged in any way. The damage was to the [buyers] and their interest in the property, not to the property itself and there is no coverage under the policy terms.

*Id.* at 33–34.

The definitions of "property damage" at issue in *Ehlers* and *Dixon* are identical to the definition at issue in this case, except for the use of the pronoun "that" as opposed to "this" in the clause, "including the loss of use of that property," in Coulter's policy with CIGNA. Under the rationale in both *Ehlers* and *Dixon*, the clause "including the loss of use of that property" can only refer to loss of use damages arising out of physical damage or destruction to tangible property. Thus, without physical damage or destruction to tangible property, one cannot recover damages for loss of use to tangible property.

*ii.* ***American Home.*** At least one court, however, has reached an opposite conclusion. In *American Home Assurance Co. v. Libbey–Owens–Ford Co.*, 786 F.2d 22 (1st Cir. 1986), which Coulter cites as the primary support for his argument, defendant provided windows for a commercial building, which subsequently failed to conform to contract specifications and had to be replaced. *American Home*, 786 F.2d at 23. The owner of the building sued defendant, seeking damages which the court grouped into two categories: (1) claims for the immediate costs of removing and replacing the windows; and (2) consequential losses suffered by the building owner as a result of the need to replace the windows. *Id.* Among the consequential losses, the building owner asserted a claim for the loss of rentals and deprivation of use of the building for thirty-three months. *Id.* Defendant sought reimbursement for the cost of the settlement from plaintiff insurer, issuer of defendant's second layer excess policy. *Id.* at 24. Plaintiff, however, disclaimed coverage, and shortly before the settlement, filed an action seeking declaratory judgment that its policy did not cover any of the claims asserted by the building owner. *Id.* Plaintiff agreed to indemnify defendant for all sums it became obligated to pay, by law or by agreement, "because of ... property damage as hereinafter defined." *Id.* Plaintiff's policy defined "property damage" as "physical injury to, or physical destruction of, tangible property, ... including the loss of use thereof." *Id.* The district court found that only the loss of rentals and deprivation of use claim was covered under the policy.[8] *Id.* The district court held, and the First Circuit Court of Appeals agreed that

> although the word "including" could suggest that loss of use must be traced to some physical injury, it was more reasonable to view the additional phrase "loss of use thereof" as including any "loss of use of tangible property," independent of physical injury to that property.

*Id.* at 25.

While the court in *American Home* found it was "more reasonable" to view the addi-

---

8. The district court, however, found that defendant had already been overcompensated for its only covered claim and that there was no excess liability to be borne by plaintiff. *American Home,* 786 F.2d at 24.

tional phrase "loss of use thereof" as including loss of use of tangible property, independent of physical injury to that property, the court also acknowledged that the word "including" could suggest that loss of use must be traced to some physical injury. *See American Home*, 786 F.2d at 25. Furthermore, the court recognized that although a number of courts have held that intangible losses, such as loss of use and diminution in value, are "property damage," all such decisions had interpreted policy language defining property damage as "injury to tangible property," rather than "physical injury to tangible property." *Id.* (citing *McDowell–Wellman Eng'g Co. v. Hartford Accident and Indem. Co.*, 711 F.2d 521, 525–26 & n. 7 (3d Cir.1983) and *Hauenstein v. St. Paul–Mercury Indem. Co.*, 65 N.W.2d 122, 124–26 (Minn. 1954)). In addition, the court stated that cases which have interpreted more recent policies in which property damage is defined as "physical" injury to tangible property have held that intangible damages, such as diminution in value, are not considered "property damage." *Id.* (citing *Wyoming Sawmills v. Transportation Ins. Co.*, 282 Or. 401, 578 P.2d 1253 (1978) and *Federated Mut. Ins. Co. v. Concrete Units, Inc.*, 363 N.W.2d 751, 757 (Minn.1985)). The court attributed the change in more recent policies to the 1973 revision of the Comprehensive General Liability Policy ("CGL"), used by many insurance companies, which expressly added the modifier "physical" to describe injury or damage under the definition of "property damage," noting that under that policy language, some physical injury to tangible property must be shown in order to trigger coverage. *See id.* Nonetheless, the court created an exception to the physical injury requirement where the claimant seeks damages for loss of use. *Id.* & n. 9.

*iii. Analysis of CGL language.* The court fails to understand the First Circuit's rationale for this exception, particularly if such an exception is based, in part, on the 1973 revision of the CGL policy. The pri-

mary reason for the 1973 revision of the CGL policy was the confusion surrounding the courts' application of the 1966 definition of "property damage" in the standardized CGL policy language. *See Eljer Mfg., Inc. v. Liberty Mut. Ins. Co.*, 972 F.2d 805, 810 (7th Cir.1992), *cert. denied*, 507 U.S. 1005, 113 S.Ct. 1646, 123 L.Ed.2d 267 (1993). The 1966 version of the General Comprehensive Liability Insurance policy had defined "property damage" as "injury to or destruction of tangible property." [9] *See id.; see also* John P. Arness & Randall D. Eliason, *Insurance Coverage for "Property Damage" in Asbestos and Other Toxic Tort Cases*, 72 VA.L.REV. 943 (Aug.1986) (hereinafter "Arness & Eliason"). While some courts gave the word "injury" a broad interpretation, *see, e.g., Elco Indus., Inc. v. Liberty Mut. Ins. Co.*, 90 Ill.App.3d 1106, 46 Ill.Dec. 319, 323, 414 N.E.2d 41, 45 (1980), others excluded injuries where there was no physical contact between the injurer and the property injured by him. *See, e.g. Sola Basic Indus., Inc. v. U.S. Fidelity & Guar. Co.*, 90 Wis.2d 641, 280 N.W.2d 211 (1979). In an attempt to alleviate the confusion involving the interpretation of the 1966 definition, the insurance industry committee in charge of revamping the CGL policy devised a two-pronged definition of "property damage." The 1973 revision defined "property damage" as either (1) "physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom;" or (2) "loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period." Arness & Eliason, 72 VA. L.REV. at 962. Thus, the primary changes in the 1973 revision were the addition of the word "physical" in the clause, "physical injury to or destruction of tangible property," and the shift of loss of use from an element of damages to an explicit trigger of "property damage" in the second prong of the definition.

---

9. The loss of use clause was not included in the 1966 definition of "property damage." Rather, damages for loss of use were relegated to the general "damages" definition, which included "damages for loss of use of property resulting

from property damage." John P. Arness & Randall D. Eliason, *Insurance Coverage for "Property Damage" in Asbestos and Other Toxic Tort Cases*, 72 VA.L.REV. 943, 957 (Aug.1986).

Both *American Home* and Coulter cite the 1973 revision and yet advocate an exception to the language requiring a physical injury or damage to accompany loss of use damages. The court, however, fails to see how the 1973 revision lends itself to an interpretation that loss of use damages unaccompanied by physical damage or injury are covered as "property damage," where the second prong of the CGL definition is not given as an alternative to the first prong. Clearly, the second prong was added in 1973 to cover loss of use damages to tangible property that are unaccompanied by physical damage or destruction. Thus, because the drafters found that a second prong was necessary for loss of use damages unaccompanied by physical damage, the first prong defining property damage as "physical injury to or destruction of tangible property . . . , including loss of use thereof at any time resulting therefrom" must require loss of use damages to be accompanied by physical injury or destruction.

*iv. Analysis of Coulter's policy with CIGNA.* CIGNA's policy closely resembles the first prong of the CGL definition and does not provide an alternative definition for loss of use damages unaccompanied by physical damage. However, Coulter would have the court read the second prong of the definition of "property damage" in the 1973 CGL policy revision into every policy. The court is unwilling to adopt such a broad interpretation of the language in Coulter's homeowners policy with CIGNA. The need for a second prong in CGL cases would be vitiated if there was an exception to definitions similar to the first prong, in which the modifier "physical" is used to describe the injury, damage, or destruction to tangible property and the resulting loss of use damages. Adding the second prong and the modifier "physical" to the first prong was intended to resolve ambiguities regarding the necessity of accompanying physical damage in a recovery of loss of use damages. Thus, it seems illogical to argue that a definition of "property damage," which is similar to the first prong of the CGL policy, covers loss of use damages which were not accompanied by physical damage or destruction to tangible property.

The court finds the state court decisions in *Ehlers* and *Dixon* advocate a more logical approach to analyzing this issue. CIGNA's policy defines "property damage" as "physical damage or destruction to tangible property, including the loss of the use of that property." The definitions of "property damage" in *Ehlers* and *Dixon* are virtually the same as the definition in the CIGNA policy, with the primary difference being the substitution of "that" for "this" in the clause "including the loss of the use of that property" in the CIGNA policy. In addition, the policies in both *Ehlers* and *Dixon* are both homeowners policies, as is Coulter's policy with CIGNA. The word "including" is defined as follows: "to take in or comprise as part of a whole." Merriam's Webster's Collegiate Dictionary 588 (10th ed. 1995). Thus, the clause, "including the loss of the use of that property," is a subset of the clause, "physical damage or destruction to tangible property." *See Ehlers*, 476 N.W.2d at 293. *Cf. American Home Assurance Co. v. Libbey–Owens–Ford Co.*, 588 F.Supp. 766, 770 (D.Mass.1984) (finding tension between the word "including," which suggests that loss of use is a subset of "physical injury to or physical destruction of tangible personal property" and the word "thereof" in the clause "including the loss of use thereof," and resolving this tension by concluding that "thereof" must refer to tangible property, independent of physical injury or destruction), *rev'd on other grounds*, 786 F.2d 22 (1st Cir.1986). Undoubtedly, the prepositional phrase, "of that property" refers to "tangible property." However, to conclude that it refers to tangible property, independent of the physical damage or destruction to tangible property, ignores the fact that "to tangible property" is also a prepositional phrase that modifies the subject of that first clause, "physical damage or destruction to tangible property" and neglects the significance of the word "including," which serves to link the two clauses. The use of the word "including" indicates that "loss of the use of that property" is one example of tangible property that has been subject to physical damage or destruction. If the second clause of the definition was meant to create a separate class of coverage that did not require

physical damage or destruction to tangible property, the word "or" would be substituted in the place of the word "including." Such a reading is not only logical in a grammatical sense, but also is consistent with the changes made in CGL policies regarding the definition of "property damage."

Examining the language as a whole, and giving the words their ordinary meanings, *Morgan,* 534 N.W.2d at 99, the court concludes the language in the definition of "property damage" in Coulter's policy is not "fairly susceptible to two interpretations." *See Met–Coil Sys. Corp.,* 524 N.W.2d at 658. Thus, the court finds the definition of "property damage" in Coulter's homeowner's policy with CIGNA is unambiguous. Because the facts appearing at the outset of the Kasters' case against Coulter do not allege physical damage to tangible property or loss of use damage to tangible property accompanied by physical damage or destruction, CIGNA did not have either potential or possible liability to indemnify Coulter. *Yegge,* 534 N.W.2d at 102; *Essex Ins. Co.,* 506 N.W.2d at 774; *First Newton Nat'l Bank,* 426 N.W.2d at 623. Thus, CIGNA did not have a duty to defend Coulter in the underlying lawsuit filed by the Kasters, *Yegge,* 534 N.W.2d at 102; *Kartridg Pak Co.,* 425 N.W.2d at 688, and the court grants summary judgment in favor of CIGNA on this issue.[10]

### 2. Loss of use of tangible property

■ In the alternative, even if CIGNA's definition of "property damage" covered loss of use damage to tangible property, independent of any physical damage or destruction to that tangible property, there must nonetheless be a "loss of use to tangible property." CIGNA argues that the Kasters' underlying lawsuit against Coulter did not allege a loss of use of tangible property and did not allege damages for loss of use. CIGNA further claims there is no evidence that the Kasters suffered a loss of use of tangible property. Coulter asserts that the underlying petition suggests there has been a loss of

money in the estates in that the Kasters allege damages for misuse of a check representing the proceeds of an inheritance. Coulter also notes there has been a loss of value in real estate, in particular, farm real estate and the Kaster insurance agency. Coulter argues that money, real estate, and the insurance agency should all be considered "tangible property."

■ Loss of use damages are typically those damages recoverable when property is temporarily unusable or damaged in some way. *See Long v. McAllister,* 319 N.W.2d 256, 261 (Iowa 1982). The amount of damages awarded for loss of use is the value of losing the benefit of that property for the time reasonably necessary to repair or replace it. *See id.* To examine Coulter's claim that the Kasters' petition alleges the loss of use of tangible property, the court will address the items Coulter argues are covered under his policy because they are damages for the loss of use of tangible property.

Coulter characterizes the Kasters' allegations against him as involving the misuse of an inheritance check, as well as the loss of use of money, real estate, and an insurance agency. Courts have held that purely economic losses, "for example, the loss of the use of money a claimant would have received but for the insured's negligence, do not constitute 'the loss of use of tangible property.'" *Snug Harbor, Ltd. v. Zurich Ins.,* 968 F.2d 538, 542 & n. 13 (5th Cir.1992) (the exchange of money for the privilege of drilling and producing oil not tangible property); *see also Keating v. National Union Fire Ins. Co. of Pittsburgh,* 995 F.2d 154, 156 (9th Cir.1993) (economic loss is not a damage or injury to tangible property); *Selective Ins. Co. of S.E. v. J.B. Mouton & Sons, Inc.,* 954 F.2d 1075, 1080 (5th Cir.1992) (claims for loss of future rent involved intangible property); *Liberty Bank of Montana v. Travelers Indem. Co. of Am.,* 870 F.2d 1504, 1508–09 (9th Cir.1989) (economic loss to lenders derived from loss of subordination in security promised by bank is not property damage); *Gulf Ins. Co. v. L.A. Effects Group, Inc.,* 827 F.2d 574, 577

**10.** Although the motion before the court is a joint motion for partial summary judgment, summary judgment in favor of CIGNA on this issue is dispositive of the case. Thus, Coulter's case against CIGNA is dismissed in its entirety.

(9th Cir.1987) (strictly economic losses like lost profits, loss of goodwill, loss of the anticipated benefit of a bargain, and loss of an investment did not constitute damage or injury to tangible property covered by a CGL policy); *Allstate Ins. Co. v. Russo,* 829 F.Supp. 24, 27 (D.R.I.1993) (lost investments and lost deposits not tangible property); *Security State Bank of Kansas City v. Aetna Casualty & Sur. Co.,* 825 F.Supp. 944, 948 (D.Kan.1993) (escrow payments tendered by check were intangible); *Lowenstein Dyes & Cosmetics, Inc. v. Aetna Life & Casualty Co.,* 524 F.Supp. 574, 577 (E.D.N.Y.1981) (business losses were not covered), *aff'd,* 742 F.2d 1437 (2d Cir.1983); *American States Ins. Co. v. Martin,* 662 So.2d 245, 248 (Ala.1995) (purely economic losses are not considered "tangible property"); *Graber v. State Farm Fire & Casualty Co.,* 244 Mont. 265, 797 P.2d 214, 216–17 (1990) (lost business and injury to reputation and goodwill are not damage to tangible property under a business owner's policy); *Travelers Indem. Co. v. Arizona,* 140 Ariz. 194, 680 P.2d 1255, 1258 (1984) (loss of investment represented by an investment certificate not a loss of tangible property); *McCollum v. Insurance Co. of N. Am.,* 132 Ariz. 129, 644 P.2d 283, 286 (App.1982) (lost profits are not property damage); *Old Republic Ins. Co. v. West Flagler Assoc., Ltd.,* 419 So.2d 1174, 1177 (Fla.Dist.Ct.App.1982) (investments, anticipated profits and financial interests in business ventures are intangibles); *Giddings v. Industrial Indem. Co.,* 112 Cal.App.3d 213, 169 Cal.Rptr. 278, 281 (1980) ("To construe the explicit words 'tangible property' to include intangible economic interests and property rights requires a strained and farfetched interpretation, doing violence to the plain language of the policies."); *Temco v. St. Paul Fire & Marine Ins. Co.,* 273 Or. 716, 543 P.2d 1, 2 (1975) (en banc) (payment of money on forged checks did not constitute injury to or destruction of tangible property). Specifically, Iowa courts have noted that economic losses, such as diminution in value and impairment of one's business, are intangible losses and do not constitute physical injury or destruction of tangible property. *See Yegge,* 534 N.W.2d at 102 (intangible economic losses are not considered "property damage); *Kartridg Pak*

*Co.,* 425 N.W.2d at 689–90 (intangible damages, such as diminution in value, do not constitute "property damage;" alleged diminution in value did not trigger coverage or duty to defend).

In the underlying lawsuit, the Kasters' allegations involve economic losses. Although money might be considered "tangible property" in situations where money has actually been destroyed or damaged, *see Security State Bank,* 825 F.Supp. at 947 (although destruction of stack of currency may be destruction of tangible property, economic losses such as lost checks or investments are not losses of tangible property) and *Travelers Indem. Co.,* 680 P.2d at 1258, there have been no allegations that money has been destroyed in this case. The Kasters have alleged that either the money in the estates was spent in a manner which did not maximize its investment value, or the money was never realized in the first place because farm values dropped and the insurance agency performed poorly. Furthermore, even if the allegations regarding Coulter's misuse of an inheritance check involved tangible property, there has been no "loss of use" of the check in that the check was used to satisfy some of the indebtedness of the estate. Lastly, there is no allegation or evidence that the Kasters lost the use of farmland or the insurance agency; rather, Coulter argues that land values dropped before land was sold, thereby resulting in a diminution of value of real estate, and that the insurance agency lost income and profits.

Clearly, the Kasters' claims involve purely intangible economic losses to the estates of James and Merle Kaster and cannot be construed as claims involving the loss of use of tangible property. *See Yegge,* 534 N.W.2d at 102; *Kartridg Pak Co.,* 425 N.W.2d at 689–90. Because the underlying suit did not allege damages for the loss of use of tangible property, CIGNA had no duty to defend Coulter in the underlying lawsuit filed by the Kasters. *Yegge,* 534 N.W.2d at 102; *Kartridg Pak Co.,* 425 N.W.2d at 688. Thus, in the alternative, the court grants summary judgment in CIGNA's favor on this ground

as well.[11]

## V. CONCLUSION

Based on a review of the summary judgment record as a whole, the court concludes the Kasters' lawsuit against Coulter does not allege "property damage" as defined in Coulter's homeowners policy with CIGNA. The definition of "property damage" in the CIGNA policy requires physical damage or destruction to accompany damages for loss of use of tangible property. Because the underlying lawsuit does not allege physical damage or destruction to tangible property, there can be no coverage of the Kaster's claims against Coulter under the policy. Thus, CIGNA did not have a duty to defend Coulter in the underlying lawsuit, and the court grants summary judgment in favor of CIGNA on this ground.

In the alternative, even if there was not a requirement of physical damage or destruction to tangible property to accompany loss of use damages to tangible property, the court finds the Kasters' suit does not allege loss of use damages to tangible property. The Kasters' claims are for intangible economic losses to the estates of James and Merle Kaster as a result of Coulter's negligence. Thus, CIGNA did not have a duty to defend Coulter in the underlying lawsuit, and the court grants summary judgment in favor of CIGNA on this ground as well.

Although this motion is a joint motion for partial summary judgment, the court's decision on this issue is dispositive of Coulter's case against CIGNA. Because the court finds that CIGNA had no duty to defend Coulter in the underlying lawsuit, Coulter's case against CIGNA is dismissed.

**IT IS SO ORDERED.**

---

**11.** Because the court is granting summary judgment on the issue of whether the underlying lawsuit alleged "property damage" as defined by the policy, it need not reach the other issues raised by the parties in their briefs.