**CONTINENTAL INSURANCE COMPANY, Appellant,**

v.

**Calvin BONES and Audrey Bones, Appellees.**

**Calvin Bones and Audrey Bones, Appellees,**

v.

**Continental Insurance Company, Appellant.**

No. 97–2034.

Supreme Court of Iowa.

July 8, 1999.

Joseph A. Happe and Patrick D. Smith of Huber, Book, Cortese, Happe & Brown, P.L.C., Des Moines, for appellant.

Philip Willson of Willson & Pechacek, P.L.C., Council Bluffs, for appellees.

Considered by McGIVERIN, C.J., and LARSON, CARTER, SNELL, and TERNUS, JJ.

TERNUS, Justice.

Appellees, Calvin and Audrey Bones, were sued when they refused to honor their contractual guarantee of their son's lease obligations, resulting in the eviction of their son's co-tenant from the premises.

The Bones seek coverage from their home-owners insurer, appellant, Continental Insurance Company, for the lawsuit filed against them by the co-tenant.

The district court granted summary judgment to the Bones, finding coverage for one of the claims of the co-tenant entitled "wrongful eviction" because that tort was included within the policy's coverage of personal injury. Simultaneously, the court denied Continental's motion for summary judgment. Our review of the undisputed facts underlying the court's rulings reveals that the claims made against the Bones are based on their breach of contract, not their commission of the tort of wrongful eviction. We also reject the Bones' claim that the co-tenant's loss of use of the leased premises constituted "property damage" as that term is defined in the Continental policy. Therefore, we reverse the district court's rulings on the parties' summary judgment motions and remand for entry of a declaratory judgment in favor of Continental.

## I. *Background Facts and Proceedings.*

The parties agree that the material facts are undisputed.

A. *Contractual agreements.* This coverage dispute has its genesis in a lease agreement between the Bones' son, Gordon, and Bernard Bunning. In July 1995, Gordon and Bunning signed a five-year lease with Sunriver Business Venture, Ltd. for the rental of a commercial building in California. Gordon planned to operate a law office out of part of the building; Bunning was an accountant and intended to use his portion of the premises for an accounting office. Gordon and Bunning agreed to divide the rent and associated expenses.

Because Gordon's credit situation was insufficient to enter into a long-term commercial lease, his parents provided Bunning with a personal guarantee wherein they agreed to establish a $50,000 line of irrevocable credit. The Bones did in fact obtain an irrevocable letter of credit from Firstar Bank of Iowa. The purpose of the letter of credit was to protect Bunning in the event of a default by Gordon on his lease obligations.

B. *Breach of the contractual agreements.* Subsequent to the execution of the lease, Gordon established a partnership with two other attorneys, David G. Knitter and Timothy J. Lopez. This partnership operated from the leased space and purportedly assumed Gordon's lease obligations. The relationship between Gordon and his new partners soured rather quickly, however, and Gordon was expelled from the partnership in August 1996.

When the October 1996 rent became due, neither Gordon nor his former partners paid their half of the rent. Bunning tendered his share to Sunriver, but this partial payment was insufficient to prevent Sunriver from serving Bunning with a three-day notice to pay the rent or surrender the premises. When payment was not forthcoming, Sunriver declared the lease terminated and filed an unlawful detainer action against Bunning, Gordon, Bones, and all persons claiming an interest in the property under them.

Upon the filing of the unlawful detainer action, Bunning attempted to have the Bones pay Gordon's overdue rent pursuant to the guarantee agreement. He also sought to draw on the letter of credit. The Bones refused to honor their guarantee and obtained an ex parte injunction preventing Bunning from drawing on the letter of credit.

In the meantime, Sunriver was successful in its unlawful detainer action and obtained a writ of possession against the lessees. Bunning was thus evicted from the premises for failure to pay rent.

C. *The underlying suit for which coverage is sought.* After his eviction from the leased premises, Bunning filed a complaint in the California state courts naming Gordon, and his parents, among others, as defendants. Six causes of action were al-

leged against the Bones, but they rest their claim of coverage on only one of the six. The relevant claim is captioned "Wrongful Eviction Against All Named Defendants Except FIRSTAR BANK OF IOWA." We will review the allegations of the complaint in more detail in our later discussion of the issues.

The Bones demanded that Continental defend them in the California action, asserting the liability coverage of their homeowners policy encompassed the claim entitled "wrongful eviction." Continental declined to defend and denied coverage.

D. *The insurance policy.* Because the dispute between the parties to this insurance contract turns on whether the complaint alleges property damage or personal injury, we will review only the policy provisions pertinent to these issues. The insuring agreement of the Continental policy obligates the insurer to defend any suit brought against the insureds for "personal injury" or "property damage" and to pay on behalf of the insureds claims for which they "are legally liable." The policy defines the term "property damage" to mean "physical injury to or destruction of real property or tangible personal property *including loss of use of the property."* (Emphasis added.) The term "personal injury" is defined as an "injury arising out of one or more of the following offenses: libel, slander, false arrest, *wrongful eviction....*" (Emphasis added.)

E. *Declaratory judgment action.* Continental brought this declaratory judgment action in the Iowa district court, asking the court to hold that it had no duty to defend or indemnify the Bones for the claims asserted against them by Bunning. The Bones filed a counterclaim, seeking a declaratory judgment that Continental did have a duty to defend and indemnify them with respect to the claims made in the California lawsuit.

The Bones filed a motion for summary judgment claiming that coverage was provided for the wrongful eviction claim under two theories: (1) the wrongful eviction claim encompassed a claim for "loss of use" within the meaning of the policy definition of property damage; and (2) this cause of action was included within the policy definition of personal injury. Continental filed its own motion for summary judgment and argued that the wrongful eviction claim was really a breach-of-contract claim that did not fall within the policy definitions of either property damage or personal injury. The district court granted the Bones' motion and denied Continental's motion. Continental appealed.

II. *Scope of Review.*

Our review of a ruling on summary judgment is for the correction of errors of law. *See DeLaMater v. Marion Civil Serv. Comm'n,* 554 N.W.2d 875, 877 (Iowa 1996). The party seeking summary judgment must establish that there are no genuine disputes with respect to material facts and that it is entitled to judgment as a matter of law. *See* Iowa R. Civ. P. 237(c).

In the case before us, the parties agree that the material facts are not in dispute. The determinative issue is whether the undisputed facts give rise to coverage under the Continental policy. This issue, in turn, depends on whether the claim entitled "wrongful eviction" falls within the policy's definition of "property damage" or "personal injury." Because the parties have offered no extrinsic evidence on the meaning of the policy language at issue, interpretation of this language is a question of law for the court. *See Tropf v. American Family Mut. Ins. Co.,* 558 N.W.2d 158, 159 (Iowa 1997).

III. *General Principles of Insurance Contract Interpretation.*

We have recently summarized the rules that guide our interpretation of insurance policies:

"The intent of the parties controls. We determine the parties' intent from

the language of the policy, unless the policy is ambiguous. Ambiguity exists when, after application of principles of contract interpretation, a genuine uncertainty remains as to which one of two or more meanings is the proper one. A mere disagreement between the parties as to the meaning of policy language does not establish an ambiguity. Only when the policy language is susceptible to two reasonable interpretations do we find an ambiguity."

We give policy language its plain and ordinary meaning and do not indulge in a strained or unnatural interpretation merely to find ambiguity.

*Id.* (citation omitted) (quoting *Kibbee v. State Farm Fire & Cas. Co.*, 525 N.W.2d 866, 868 (Iowa 1994)). These are the principles we apply as we interpret the homeowners policy issued by Continental to the Bones.

### IV. *Property Damage.*

■ As mentioned above, the policy defines property damage as "physical injury to or destruction of real property or tangible personal property including loss of use of the property." The Bones claim that because Bunning's eviction from the premises resulted in his loss of use of the real estate, he has alleged property damage for which the policy provides coverage. They make no claim that any real or personal

property was physically injured or destroyed.

■ Whether the loss of use of property must be caused by the property's physical injury or destruction in order to fall within the policy definition of property damage is an issue of first impression for this court.[1] In fact, very few courts have addressed this issue with respect to the policy language before us, and those courts have reached differing results. *Compare Coulter v. CIGNA Prop. & Cas. Cos.*, 934 F.Supp. 1101, 1121–22 (N.D.Iowa 1996) (holding loss-of-use damages must arise from physical damage or destruction of tangible property); *Dixon v. National Am. Ins. Co.*, 411 N.W.2d 32, 33–34 (Minn. Ct.App.1987) (same); *Ehlers v. Johnson*, 164 Wis.2d 560, 476 N.W.2d 291, 292 (Wis. Ct.App.1991) (same), *with American Home Assurance Co. v. Libbey–Owens–Ford Co.*, 786 F.2d 22, 25 (1st Cir.1986) (holding property damage definition includes loss of use not resulting from physical injury or destruction of tangible property); *Gibson v. Farm Family Mut. Ins. Co.*, 673 A.2d 1350, 1353 (Me.1996) (same).[2] In considering the analysis employed by these courts in their interpretation of the policy definition of property damage, we find more persuasive the reasoning of those courts holding that loss-of-use damages must arise from physical damage or destruction of tangible property.

**1.** This court has considered a similar issue before, but under policy language significantly different from the language before us here. *See First Newton Nat'l Bank v. General Cas. Co.*, 426 N.W.2d 618, 626 (Iowa 1988). In *First Newton*, the applicable policy defined property damage as

(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property *which has not been physically injured or destroyed* provided such loss of use is caused by an occurrence during the policy period.

*Id.* (emphasis added). We held that loss of use was covered even though the property was not physically injured. *Id.* Significantly,

the policy issued by Continental does not include the second part of the definition of property damage present in the *First Newton* case.

**2.** The policy definitions of property damage considered in these cases vary slightly, sometimes referring to "the loss of use of *that* property," "the loss of use of *this* property," "the loss of use *thereof*," or, as in the case before us, "the loss of use of *the* property." We conclude these minor variations are not material to an interpretation of these policy definitions, which, as our subsequent discussion reveals, turns on the history of this policy provision and the common meaning of the verb, "including." *See Coulter*, 934 F.Supp. at 1119. These decisive elements are present in all the quoted versions of the definition.

The federal district court in *Coulter* relied on the historical development of the policy definition of property damage, as well as the common meaning of the policy language, in deciding that the policy unambiguously required physical damage or destruction of property to trigger coverage. 934 F.Supp. at 1118–21. As discussed in detail in *Coulter*, insurers at one time defined property damage as "injury to or destruction of tangible property." *Id.* at 1120. In 1973, as part of a revision of the standard comprehensive general liability (CGL) insurance form, this definition was changed to avoid any confusion as to whether *physical* injury was required, or whether *intangible* damages, such as diminution in value and loss of use, was covered. *See id.* The revised definition included both (1) " 'physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom,' " or (2) " 'loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.' " *Id.* (quoting John P. Arness & Randall D. Elianson, *Insurance Coverage for "Property Damage" in Asbestos and Other Toxic Tort Cases*, 72 Va. L.Rev. 943, 962 (Aug.1986)). The court in *Coulter* found it significant that the policy before it, like the one before this court, did not include the second part of the 1973 definition of property damage:

> The court, however, fails to see how the 1973 revision lends itself to an interpretation that loss of use damages unaccompanied by physical damage or injury are covered as "property damage," where the second prong of the CGL definition is not given as an alternative to the first prong. Clearly, the second prong was added in 1973 to cover loss of use damages to tangible property that are unaccompanied by physical damage or destruction. Thus, because the drafters found that a second prong was necessary for loss of use damages unaccompanied by physical damage, the first prong

defining property damage as "physical injury to or destruction of tangible property . . ., including loss of use thereof at any time resulting therefrom" must require loss of use damages to be accompanied by physical injury or destruction. *Id.* at 1121 (interpreting language "including the loss of use of that property").

The ordinary meaning of the language of the policy definition was also determinative in the decision of the *Coulter* court, as well as in the decision of the Wisconsin Court of Appeals in the *Ehlers* case. *See id.; Ehlers*, 476 N.W.2d at 293. The Wisconsin court explained its reasoning in this regard as follows:

> We conclude that the clause "including loss of use of this property" is unambiguous. The only reasonable meaning of the clause is that it defines property damage to include loss of use damage that accompanies physical injury or destruction. . . .
>
> The loss of use clause is introduced by the verb "including." The dictionary defines "including" as "to take in or comprise as part of a whole. . . ." *The Mirriam–Webster Dictionary* 358 (1974). The loss of use clause is thus introduced as a subset of "physical injury to or physical destruction of tangible property." If the loss of use clause were interpreted as the [insureds] would have it, i.e., as any nonphysical injury to tangible property, the definition of property damage would effectively read: "physical injury to . . . tangible property, including non-physical injury." We reject such a contradictory reading.

*Ehlers*, 476 N.W.2d at 293. *See generally* 2 Eric M. Holmes & Mark S. Rhodes, *Appleman on Insurance 2d* § 6.5, at 242 (1996) ("[A]bsent circumstances indicating a contrary intention, the words in a policy are to be construed in their plain, ordinary and popular sense.") [hereinafter *Appleman on Insurance 2d*].

■ We find the reasoning of the two courts reaching a contrary conclusion less

persuasive. The Maine court's analysis was very abbreviated; without any discussion of the policy language, the court merely cited as support for its holding the general principle that policies of insurance are interpreted " 'most strongly' against the insurer." *Gibson,* 673 A.2d at 1353. Unless there are two reasonable meanings from which to choose, however, the rule that a contract is construed against the party who drafted it does not come into play. *See Iowa Comprehensive Petroleum Storage Tank Fund Bd. v. Federated Mut. Ins. Co.,* 596 N.W.2d 546, 551 (Iowa 1999) (refusing to construe policy exclusion in favor of insured when no ambiguity existed); 2 *Appleman on Insurance 2d* § 6.1, at 142 ("The finding of the existence of an ambiguity is the threshold for the application of the doctrine [that the policy is construed against the insurer]."); Restatement (Second) of Contracts § 206, at 105 (1979) (applying rule "[i]n choosing among the reasonable meanings of a promise or agreement or term thereof"). The Maine court failed to explain why the interpretation it adopted was a reasonable meaning based on the language of the policy. *See generally Tropf,* 558 N.W.2d at 159 ("We determine the parties' intent from the language of the policy, unless the policy is ambiguous."). Therefore, the unexplained and unsupported conclusion reached in the *Gibson* case is not helpful.

The First Circuit's analysis in the *American Home* case is equally unenlightening. *See American Home Assurance Co.,* 786 F.2d at 25. Although the federal court acknowledged that under the 1973 revision, "some physical injury to tangible property must be shown in order to trigger coverage," it created an exception for loss-of-use damages. *Id.* The court appeared to agree with the lower court's conclusion that "it was more reasonable to view the additional phrase 'loss of use thereof' as including any 'loss of use of tangible property,' independent of physical injury to that property." *Id.* (citing *American Home Assurance Co. v. Libbey–Owens–Ford Co.,* 588 F.Supp. 766, 769–71

(D.Mass.1984)). The reason given by the district court to support this conclusion was the difference in language between the standard CGL definition and the more abbreviated form used by the insurer in *American Home. American Home Assurance Co.,* 588 F.Supp. at 769–70 (discussing differences in wording between 1973 revision, "including the loss of use thereof at any time resulting therefrom," and the easy-read version used by American Home, "including the loss of use thereof"). The different language in the more simplified version is important, however, only if the difference gives rise to a contrary, *reasonable* interpretation. For the reasons discussed by the courts in *Coulter* and *Ehlers,* we do not think the alternative interpretation given the easy-read definition of property damage is reasonable, nor is it consistent with the policy language.

In our view, neither the First Circuit, the Maine Supreme Court, nor the insureds in the present case have presented a cogent rationale for their interpretation of the policy. Therefore, we conclude that the only reasonable interpretation of the policy definition of property damage is that adopted by the courts in *Coulter, Ehlers,* and *Dixon.* Accordingly, damages for loss of use of tangible property are covered by the Continental policy only if the property has been physically injured or destroyed. Because there is no dispute that the premises from which Bunning was evicted were *not* physically injured or destroyed, any loss of use of those premises for which Bunning seeks to recover in the California lawsuit is not covered "property damage" under Continental's policy of insurance.

## V. *Personal Injury.*

■ It is helpful at this point in our discussion to review the allegations of Bunning's complaint in more detail. The Bones rest their claim of coverage on the count entitled "Wrongful Eviction Against All Named Defendants Except FIRSTAR

BANK OF IOWA." The pertinent paragraph of this count states:

> On or about October 29, 1996, defendant SUNRIVER actually and constructively wrongfully evicted plaintiff from the Premises by serving a three-day notice on plaintiff to pay rent or quit the premises, filing an Unlawful Detainer action against plaintiff and wrongfully declaring the Lease to be terminated. Defendants DAVID G. KNITTER, TIMOTHY J. LOPEZ, KNITTER & LOPEZ, GORDON G. BONES, CALVIN BONES and AUDREY BONES participated in and were a substantial factor in bringing about this wrongful eviction *by their wrongful conduct as set forth throughout this complaint,* the allegations of which are incorporated herein by reference.

(Emphasis added.) Two allegations of wrongful conduct against Calvin and Audrey Bones ar made in the complaint:

> 23. On November 6, 1996, defendants CALVIN BONES, AUDREY BONES, and GORDON G. BONES, through their attorney, sent a written request to defendant FIRSTAR that it not allow BUNNING to draw on the Irrevocable Letter of Credit. A true and correct copy of this request is attached to this Complaint as Exhibit J.

> 24. On or about November 8, 1996, defendants CALVIN BONES and AUDREY BONES filed an action in Pottawattamie County District Court in the State of Iowa and obtained an ex parte Writ of Injunction against BUNNING and defendant FIRSTAR enjoining BUNNING from drawing on the Irrevocable Letter of Credit and enjoining FIRSTAR from paying BUNNING pursuant to the Irrevocable Letter of Credit. A true and correct copy of the Petition for Injunction and accompanying Order are attached to this complaint as Exhibit K.

The Bones have not submitted any relevant facts other than those contained in the California complaint. Therefore, we will determine coverage from the allegations of fact made in that complaint. *See First Newton Nat'l Bank v. General Cas. Co.,* 426 N.W.2d 618, 623 (Iowa 1988).

We now turn to the policy language to determine whether the facts alleged in the complaint give rise to a "possible or potential liability to indemnify" the Bones. *Id.* The Bones claim that Bunning's allegations constitute a claim for wrongful eviction so as to fall within the policy's definition of personal injury, which includes the offense of wrongful eviction. They primarily rely on the fact that the count in question is entitled "wrongful eviction," as well as Bunning's allegation that the Bones "participated in and were a substantial factor in bringing about this wrongful eviction." We conclude, however, from our review of the complaint that the Bones are not alleged to have wrongfully evicted Bunning from the premises, but rather that the wrongful eviction is the damage sustained by Bunning as a result of the Bones' wrongful conduct.

■ We start with the observation that coverage is controlled by the actual claim asserted against the insured, not the label the claimant chooses to put on his or her claim. *See Essex Ins. Co. v. Fieldhouse, Inc.,* 506 N.W.2d 772, 775 (Iowa 1993). Any other rule would invite claimants to manipulate coverage by simply putting a caption that would trigger coverage on a claim that would otherwise not fall within the policy's terms. Therefore, the fact that Bunning entitled his claim against the Bones "wrongful eviction" does not establish coverage for this claim.

■ We now examine the factual allegations of the complaint to determine what claim was actually asserted by Bunning. *See Reames v. State Farm Fire & Cas. Ins.,* 111 Md.App. 546, 683 A.2d 179, 186 (1996). The claim made against the Bones is based on their refusal to honor their guarantee agreement to allow Bunning to draw on the letter of credit. This wrongful conduct does not constitute the tort of

wrongful eviction. *See generally Barkett v. Brucato,* 122 Cal.App.2d 264, 264 P.2d 978, 986 (1953) (recognizing tort of wrongful eviction in California and setting forth the elements of this tort). The tort of wrongful eviction requires a " 'nontrespassory invasion of another's interest in the private use and enjoyment of land.' " *Id.* (quoting Restatement of Torts § 822 (1939)). The Bones are not alleged to have invaded Bunning's use of the leased premises. To the contrary, Bunning alleged that *"SUNRIVER* actually and constructively wrongfully evicted plaintiff from the premises." (Emphasis added.) Although the Bones refused to pay their son's share of the rent to Sunriver, they did not evict Bunning from the premises, or cause him to be evicted. Their breach of contract was merely one reason that the rent remained unpaid, which in turn was the condition that allowed *Sunriver* to evict Bunning.

Stated differently, the damages sought by Bunning from the Bones arose out of the Bones' breach of contract, not from any wrongful eviction. Bunning's eviction from the leased premises is relevant only insofar as it is an element of damage arising from the Bones' breach of contract.

This conclusion is in accord with the holding of other courts considering analogous facts. In *Pace Construction Co. v. United States Fidelity & Guaranty Insurance Co.,* 934 F.2d 177 (8th Cir.1991), the insured, Pace Construction Co., was sued because it had failed to procure liability insurance for its prime contractor, Fred Weber, Inc., as required by the contract between Pace and Weber. 934 F.2d at 178. This breach was brought to light when Weber was sued for bodily injuries sustained by a third party arising out of the construction project; Weber discovered at that time that Pace had not provided the agreed-upon insurance. *Id.* Pace sought coverage from United States Fidelity & Guaranty Insurance Co. (USF&G) for the claim made against it by Weber, contending that its potential liability was based on "an accident resulting in unexpected and unintended bodily injury" as required by the policy issued to Pace by USF&G. *Id.* at 179. The Eighth Circuit Court of Appeals rejected this argument, stating,

> Pace, having breached its contractual duty to procure insurance, became legally obligated to pay damages to Weber, but those damages were not "because of bodily injury caused by an occurrence." Weber's damages, while measured by [the third party's] injuries, were caused, not by [the third party's] accident, but by Pace's breach.

*Id.* at 180.

The Alabama Supreme Court made a similar distinction in *Reliance Insurance Co. v. Gary C. Wyatt, Inc.,* 540 So.2d 688 (Ala.1988). In that case, the insured contractor, Wyatt, had failed to procure insurance as required by the contract between Wyatt and the business that had leased a crane to Wyatt. *Reliance Ins. Co.,* 540 So.2d at 689. One of Wyatt's employees was injured when the crane struck the employee; the employee sued the lessor. *Id.* The lessor then brought an action against Wyatt, claiming damages for Wyatt's failure to include the lessor as a named insured on Wyatt's liability insurance policy. *Id.* Wyatt sought coverage from Reliance for the lessor's claim on the basis that the lessor's claim was for the employee's bodily injuries. *Id.* Therefore, claimed Wyatt, the lessor's claim fell within the policy's coverage for bodily injuries caused by an occurrence. *Id.* The Alabama Supreme Court rejected this argument, with the following analysis:

> The breach of contract was the failure to procure liability insurance. This is not an "occurrence" that results in bodily injury or property damage. [The employee's] injury may go to the issue of damages sustained by this breach of contract, but it is not the "occurrence" that causes the breach of contract. The

contract had been breached, with or without [the employee's] injury.

*Id.* at 690.

The same reasoning is appropriate here. The Bones' wrongful conduct is their failure to perform the guarantee agreement. Bunning's eviction may go to the issue of damages, but the contract had been breached when the Bones failed to pay Gordon's rent, regardless of whether Bunning was eventually evicted.

■ Before we conclude our discussion of this issue, we address a final argument made by the Bones in reliance on Continental's agreement in the policy to provide a defense "even if the suit is groundless." The Bones argue that they should not be denied a defense simply because Bunning has not adequately pled or cannot prove a claim of wrongful eviction. This argument, however, is contrary to our previous interpretation of the groundless-suit language upon which the Bones rely. In *Chipokas v. Travelers Indemnity Co.,* 267 N.W.2d 393 (Iowa 1978), we stated that "[g]roundless suits, under this provision, are those with allegations which bring them within the coverage of the policy but fail in law or in their proof." 267 N.W.2d at 396. Here, Bunning's allegations fail to bring his claim within the coverage of the policy. As we held in *Chipokas,* this policy language "does not import a duty to defend where there is no claim within the liability coverage." *Id.*

In summary, we hold that the claim made against the Bones, although entitled "wrongful eviction," is based not on the tort of wrongful eviction, but on the Bones' breach of contract. Therefore, this claim does not fall within the policy definition of personal injury. *Cf. County of Columbia v. Continental Ins. Co.,* 83 N.Y.2d 618, 612 N.Y.S.2d 345, 634 N.E.2d 946, 950 (1994) (holding that allegations of "continuing nuisance" and "continuing trespass" based on insured's contamination of plaintiff's property did not constitute a "personal injury" because those "allegations ... are not among the enumerated offenses cov-

ered by the personal injury endorsement"); *Continental Cas. Co. v. Alexis I. duPont Sch. Dist.,* 317 A.2d 101, 105 (Del. 1974) (holding claims made by third party against the insured did not "charge any offense" included within the policy definition of "personal injury"). The trial court erred in so ruling.

### VI. *Disposition.*

We hold that the trial court erred in granting summary judgment to the Bones. Because the undisputed facts show there is no possibility that Continental would be liable under its policy, the trial court should have granted Continental's motion for summary judgment. We reverse the rulings of the district court on the parties' motions for summary judgment. We remand to the district court for entry of summary judgment in favor of Continental holding that it has no duty to defend or indemnify the Bones with respect to the claims made against them by Bunning.

**REVERSED AND REMANDED.**