# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-2487

_____

Spirco Environmental, Inc., formerly     *
known as Spirco Services, Inc.,     *
    *
       Plaintiff - Appellee,     *
    *
    *    Appeal from the United States
    v.         *    District Court for the Eastern
    *    District of Missouri.
American International Specialty Lines     *
Insurance Company,     *
    *
       Defendant - Appellant.     *

_____

Submitted: December 14, 2007
Filed: February 3, 2009

_____

Before BYE, ARNOLD, and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

Defendant American International Specialty Lines Insurance Company ("American") appeals an adverse grant of summary judgment in which the district court[1] held American must provide coverage to Plaintiff Spirco Environmental, Inc.

---

[1]The Honorable David D. Noce, United States Magistrate Judge for the Eastern District of Missouri, sitting by consent of the parties in accordance with 28 U.S.C. § 636(c).

("Spirco"), for a separate judgment in which the same court held Spirco and others were liable to pay a surety's attorney and expert witness fees. We affirm.

I.      Background

Relevant background information is provided in our separate opinion in Case No. 07-1547. That case involved a claim by a surety against a group of contractors for payment of the surety's attorney and expert witness fees under an indemnity agreement. In Case No. 07-1547 we affirmed the district court's holding that the contractor-indemnitors were liable to the surety for approximately $800,000 in fees incurred in the defense of a $4 million claim by a New Jersey property owner. The surety incurred these substantial attorney and expert witness fees in a protracted arbitration proceeding focused on the alleged release and spread of asbestos by one of the contractor-indemnitors, Spirco. The present case involves a claim by Spirco against its general casualty and pollution insurer, American, for coverage of the fee award.

We incorporate by reference the facts set forth in Case No. 07-1547 and also set forth the following, additional facts. When the property owner asserted its counterclaims in the arbitration, the property owner labeled the claims as breach of contract counterclaims. During the course of arbitration, when counsel for Spirco sent a letter to the surety simultaneously advocating an aggressive defense and complaining about the surety's participation in the arbitration, counsel for Spirco described the property owner's claims as follows:

> My review to date reflects that many of the claims being presented would fall into the category of property damage rather than non-performance of work. [The property owner's] own mediation position paper reflects this fact:

The lion's share of the contamination, as well as the cost of the second remediation, however, resulted from Spirco's negligent work practices that permitted [Asbestos Containing Material] to contaminate areas in the Building that did not contain asbestos and should have been protected.

As discussed in Case No. 07-1547, the arbitrators' findings also demonstrate that the nature of the alleged harm stemmed from property damage rather than breach of contract. Specifically, the arbitrators held that Spirco performed under the contract and, after Spirco left the site, other parties damaged the property owner's building by exposing asbestos and causing its spread throughout the site.

When the surety later asserted a claim for fees against Spirco and the other indemnitors, Spirco sought coverage and a defense from American. American provided a defense under a reservation of rights, but, ultimately denied coverage.[2] Spirco then brought the present declaratory judgment action seeking resolution of the coverage issue.

American argued below that the fee award was in the context of a dispute having its roots in contract—the fees were due under an indemnity agreement, and the underlying arbitration dispute between the property owner and Spirco involved the alleged breach of a remediation contract between Spirco and the property owner. Spirco argued that the fee award had its roots in a claim of property damage—the property owner alleged not only that Spirco breached a remediation contract, but that Spirco spread asbestos to previously uncontaminated areas of the property, requiring

_____

[2]Spirco argues on appeal that American's reservation of rights was only partial and that American's failure to more fully reserve its right to deny coverage precludes American from adopting its current position. We have reviewed American's reservation of rights and find Spirco's argument to be without merit. At any rate, our resolution of this appeal in Spirco's favor moots this point.

the property owner to undertake a second, more expensive remediation of the building.

American argued in the alternative that even if the court were to accept Spirco's characterization of the underlying dispute between the property owner and Spirco as one involving property damage, the indemnity award should not be covered by the American policy because: (1) the contractual indemnity award was too attenuated from the alleged property damage; (2) the indemnity award was economic loss rather than property damage; and (3) certain exclusions would prevent coverage even if American's policy were otherwise found to apply.

Regarding the "attenuation" argument, the American policy provided coverage for a "Loss as a result of Claims for . . . Property Damage." The policy defined Loss in relevant part as "1. Monetary awards or settlements of compensatory damages arising from . . . Property Damage; 2. Clean-Up costs; or 3. Claim Expenses." American argued that the operative causation language in the coverage provision, "as a result of," demanded a narrow construction that looked only to the immediate cause of the alleged expense.[3] According to American, this immediate cause was a contract claim on the indemnity agreement, and there was no coverage for contract claims. Spirco argued that the operative causation language "as a result of" merited a broader construction and that it was permissible to look behind the contractual indemnity right to examine the facts of the underlying dispute between the New Jersey property owner and Spirco that gave rise to the expenses covered by the indemnity agreement. According to Spirco, the underlying dispute was a claim for property damage.

---

[3]The parties appear to agree that the operative language in the coverage provision, "as a result of," controls. The operative language in part of the definition of "Loss," *i.e.*, "arising from," is broad in scope, and the parties do not assert that this separate language provides any additional limitation on the operative language from the coverage provision.

The district court held: (1) the underlying dispute was a property damage dispute; (2) the indemnification award was not too attenuated from the property damage claim to trigger coverage; and (3) no policy exclusions applied. Accordingly, the district court ordered American to provide coverage. American appeals.

## II. Discussion

### A. Coverage

#### i. Nature of the Underlying Dispute

The property owner characterized its arbitration counterclaim against Spirco as a breach of contract claim, but the substance of the property owner's claim was an allegation of property damage. The property-damage nature of the counter-claim was apparent to Spirco's attorney at the outset of the arbitration, apparent from the nature of the arguments presented in arbitration, and apparent from the arbitrators' findings. The arbitrators found that Spirco had completed the remediation contract and left the site in a clean condition. The arbitrators found further that the property owner's allegations related to asbestos not exposed by Spirco during Spirco's remediation of the site. Rather, the arbitrators found that other contractors accessed the site after Spirco left and that these other contractors were responsible for the asbestos contamination. The alleged damages of $4 million that the property owner sought from Spirco included the purported cost of clean-up, remediation, or destruction for a section of the property outside the scope of the original contract with Spirco. Ultimately, the property owner's claim was not simply a breach of contract claim limited to the task of finishing a job commensurate in scope with the original contract between Spirco and the property owner; it was a claim for property damages shown to be unrelated to the work under the contract.

Further, we note that the property owner dismissed a separate bad-faith failure to pay claim against the surety before the surety incurred the bulk of its attorney and expert witness fees. Accordingly, the only claim against the surety that survived into the expensive and protracted arbitration was derivative of the property owner's claim against Spirco. It was not an independent bad-faith claim that might be viewed as more attenuated from the property damage claim.

We believe that for coverage purposes in the instant case, then, the district court properly characterized the underlying arbitration claim as a claim for property damage. This conclusion is based on the property owner's factual assertions, the substance of the property owner's claims, and the arbitrators' findings rather than the label, "breach of contract," that the property owner elected to attach to its claim. See Mo. Terrazzo Co. v. Iowa Nat'l Mut. Ins. Co., 740 F.2d 647, 650 (8th Cir. 1984) (applying Missouri law and looking to the facts behind a claim (property damage) rather than the label attached to a claim (diminution in value) to determine that insurance coverage existed for the claim); see also Lamar Homes, Inc. v. Mid-Continent Cas. Co., 242 S.W.3d 1, 15 (Tex. 2007) (stating that the duty to defend is not determined "by the labels attached to the underlying claims"); Cont'l Ins. Co. v. Bones, 596 N.W.2d 552, 559 (Iowa 1999) ("We start with the observation that coverage is controlled by the actual claim asserted against the insured, not the label the claimant chooses to put on his or her claim."); Auto-Owners Ins. Co. v. Toole, 947 F. Supp. 1557, 1564 (M.D. Ala. 1996) ("Nevertheless, this court declines to adopt any broad holding that claims sounding in contract are not occurrences. Rather, the court agrees with the Supreme Court of Vermont that, in determining whether there is coverage, the court should look to the specific 'kind of . . . claim' being asserted, regardless as to whether it is labeled a contract claim, a tort claim, or whatever, and the 'purpose of the general liability policy' from which coverage is sought." (quoting City of Burlington v. Nat'l Union Fire Ins. Co., 655 A.2d 719, 722 (Vt. 1994))); First Wyo. Bank, N.A., Jackson Hole v. Cont'l Ins. Co., 860 P.2d 1094, 1099-1101 (Wyo 1993) (rejecting a duty to defend based on the substance rather than the label of claims

and stating, "Although there is a claim in the complaints labeled 'NEGLIGENCE,' the facts in the complaint do not demonstrate alleged loss resulting from negligence or alleged loss 'caused by an occurrence,' but instead demonstrate alleged losses resulting from a breach of contract").

### ii. Interpretation of the Operative Language in the Policy

Because we agree with the district court that it is appropriate to characterize the underlying dispute as one involving a claim for property damage, it is necessary to examine the operative, coverage-triggering language of the American policy. The specific question we face is whether the loss, a contractual indemnity award for a surety's fees incurred in defense of the property damage claim, falls within the scope of the policy's definition of "Loss." Spirco urges us to answer this question in the positive, while American argues the loss is too attenuated from the alleged property damage to justify coverage. The parties agree that Missouri law applies to our interpretation of the American policy. The parties also agree that the operative language at issue in this case is "as a result of," such that coverage exists for a "Loss" that occurred "as a result of" property damage. Finally, the parties agree that there is no Missouri precedent exactly on point to provide clear guidance as to the scope of the operative language "as a result of."

There are, however, several cases involving a similar phrase, "resulting from." Finding no convincing authority describing a meaningful basis to distinguish between the terms "as a result of" and "resulting from," we presume that Missouri would apply the same interpretation to both phrases.

In Poage v. State Farm Fire & Casualty Co., 203 S.W.3d 781, 785–88 (Mo. Ct. App. 2006), the court interpreted causation language in a liability policy covering a recreational pontoon boat. The policy language at issue in Poage was "resulting from." The court in Poage noted that the Missouri Supreme Court previously had

interpreted this language more narrowly than the phrase "arising out of." Id. at 785; see also Spirtas Co. v. Fed. Ins. Co., 521 F.3d 833, 835–36 (8th Cir. 2008) (affirming a broad construction of the insurance policy language "arising from"). In an effort to better articulate the causal relationship described by the phrase "resulting from," the court in Poage reviewed the facts and policy language in several cases. The court held that the language "resulting from" was more narrow than the language "arising out of," but was not so limited as to be synonymous with proximate or immediate causation. Poage, 203 S.W.3d at 785–86. Rather, the Poage court held that the language "resulting from" required the causative link between a harm and a covered occurrence or event to be "reasonably apparent" such that the harm could be considered a "natural and reasonable incident or consequence of" the covered event or occurrence. Id. at 787.

In reviewing the earlier cases, the Poage court described application of the "resulting from" language in several unique and unusual circumstances. Read in light of Poage, this collection of cases serves to illustrate the "reasonably apparent" or "natural and reasonable incident or consequence" test. Typically, such a collection of cases would serve as a helpful tool for drawing the fine distinctions necessary to distinguish harms that are "reasonably apparent" from harms that are not. Unfortunately, because the facts of Poage and the cases cited therein differ dramatically from one another, the cases do not lend themselves to meaningful comparisons, and these important distinctions remain unclear.

For example, in Poage itself, the question at issue in the coverage dispute was whether a liability policy for a pontoon boat covered injuries to a person who had been an occupant of the insured boat, but who was swimming in open water about twenty-five feet from the insured boat when a different, passing boat struck her. Id. at 782. The Missouri Court of Appeals in Poage held that the personal injury resulting from the collision between the passing boat and the swimmer was "a natural and reasonable incident or consequence" of the use of the insured boat. Id. at 787–88.

The result obtained in Poage, therefore, sets forth a seemingly broad construction of the "reasonably apparent" test.

In reaching this conclusion, the Poage court cited State Farm Mut. Auto. Ins. Co. v. Flanary, 879 S.W.2d 720 (Mo. Ct. App. 1994), State Farm Mut. Auto. Ins. Co. v. Whitehead, 711 S.W.2d 198 (Mo. Ct. App. 1986), and Fidelity and Cas. Co. of New York v. Wrather, 652 S.W.2d 245 (Mo. Ct. App. 1983). In all three cases, the operative causation language was "resulting from." Whitehead and Wrather, like Poage, suggest a fairly broad meaning for the term "resulting from"; Flanary does not. In Flanary the court found no coverage. Flanery, 879 S.W.2d at 724. The policy at issue in Flanary was a liability policy insuring a truck. Id. at 721. The policy insured against "bodily injury to others . . . caused by accident resulting from the ownership, maintenance or use of [the insured truck]." Id. The owner of truck had driven the truck to a construction site carrying a portable welder. At the site, the owner parked the truck next to a crane and operated the portable welder to fabricate a boom for a crane. The portable welder was not attached to the insured truck's power supply at the time of its use. During construction of the boom, the crane collapsed and injured another person. The court held the causal relationship between the injury and "the ownership, maintenance or use of" the insured truck was too attenuated to justify coverage under the operative "resulting from" language. Id. at 724.

In Wrather, policy language that was materially the same as in Flanary resulted in a finding of coverage. Wrather, 652 S.W.2d at 247. There, a farmer used an insured automobile to drag a burning tire through a field in an effort to light the field on fire to burn off vegetation. Id. Smoke from the resulting fire blew across a nearby highway, decreased visibility, and led to an accident and injury not involving the insured vehicle. Id. Similarly, in Whitehead, the court found coverage under an automobile liability policy. Whitehead, 711 S.W.2d at 201. There, one passenger in an insured vehicle shot another passenger. The court in Whitehead found coverage emphasizing that the vehicle was not simply the situs of the shooting, but that the

-9-

vehicle was being used to transport the shooter and the victim at the time of the shooting. Id. at 199–200.

While these cases clearly establish a causal nexus somewhere short of proximate cause, it is not clear how the causal nexus in each case can be said to be "reasonably apparent." In Poage, the insured boat had carried the injured swimmer to the general area where the collision occurred between the swimmer and an entirely separate vessel, and there was coverage. In Flanary, the insured truck carried the welder and welding equipment to the general area where the construction accident occurred, but there was no coverage. In Whitehead, one passenger in a vehicle shot another passenger, and there was coverage. In Wrather, the insured vehicle was merely a tool for pulling a burning tire, but injuries causally related to the smoke from that fire were found to be covered. Flanary is difficult to reconcile with the three other cases, but Whitehead, Wrather, and Poage collectively suggest a broad construction for the term "reasonably apparent" under Missouri law.

At the end of the day, it is not clear in the present case what result must flow from application of Missouri's "reasonably apparent" or "natural and reasonable incident or consequence of" test. Missouri, however, applies a general rule of construction requiring courts to interpret ambiguities in an insurance policy in favor of coverage and against the insurer. Poage, 203 S.W.3d at 783–84 ("It is important to note that insurance policies are designed to provide protection and will be liberally interpreted to grant, rather than deny, coverage. . . . If there is an ambiguity, it will be construed in favor of the insured."). Given this state of the law in Missouri, and given the general rule that we must resolve ambiguities in favor of coverage, we believe it is necessary to view the present harm as "reasonably apparent" under Poage such that there is coverage.

Rarely will construction, demolition, or remediation projects that are substantial in scope not involve sureties, and rarely will surety bonds not be dependent on

indemnification of the surety by the bond purchaser. In fact, surety law, even in the absence of an express indemnification agreement, may in many circumstances imply this duty of indemnification. See, e.g., U.S. Fid. & Guar. Co. v. Centropolis Bank of Kansas City, Mo., 17 F.2d 913, 916 (8th Cir. 1927) (applying Missouri law and recognizing a common law duty to indemnify a surety); 23 Williston on Contracts § 61:59 (Richard A. Lord 4th ed. 2008) ("[E]ven in the absence of any express contract of indemnity, the principal obligor is impliedly bound to indemnify the surety and make it whole."). Without such a duty, the surety would be more akin to an insurer with subrogation rights only as against third parties rather than a guarantor who may look to the contracting party itself for satisfaction. Against this backdrop, the surety's defense costs were "reasonably apparent" and a "natural and reasonable incident or consequence of" the underlying property damage claim. As such, we believe the district court correctly held that the judgment against Spirco for the surety's fees fell within the policy's coverage provision.

American cites our decision in Esicorp, Inc. v. Liberty Mutual Insurance Co., 266 F.3d 859 (8th Cir. 2001), in support of its position that there should be no coverage for the surety fees at issue in the present case. Esicorp was a coverage dispute involving a commercial general liability policy that contained the causative-language phrase "because of . . . property damage." Id. at 861. American appears to argue that we accorded a narrow meaning to this policy language, excluding coverage for any direct or indirect consequential costs that do not, in and of themselves, satisfy the policy definition for "property damage." In fact, American's argument, if correct, would appear to accord no breadth whatsoever to the phrase "because of" and effectively eliminate any coverage for damages that are in any degree attenuated from damages that are conceded or proven to be "property damage."

We disagree. We find two holdings in Esicorp. Esicorp holds first that, when a contractor installs faulty material and must destroy or tear apart a structure to reach and replace the faulty material in order to properly complete a job, the tear-out and

-11-

rebuilding costs are not "property damage" as that term generally is used in standard commercial general liability policies. In fact, we distinguished this situation from a situation where faulty materials or faulty parts actually fail and cause harm in some other way:

> It is significant that the defectively welded pipe sections did not collapse or burst or otherwise cause accidental injury to surrounding property as a result of SLT's negligent inspection. Instead, Esicorp argues that the incorporation of the defectively welded pipe sections into the partially completed pipe system was covered property damage, and therefore all direct and consequential costs resulting from that damage are covered losses.

Id. at 862. In rejecting the contractor's theory, which we labeled an "incorporation theory," we made clear that we were examining the meaning of the policy term "Property Damage," and we made no reference to the language "because of." In fact, we analyzed the definition of the term "Property Damage" in standard, pre-1973 commercial general liability policies and in different, standard, post-1973 policies. In neither examination did we focus on the causative language "because of." Maintaining our focus on the definition of "property damage," we held:

> After careful review of this more recent line of cases, we conclude the Supreme Court of Missouri would reject Esicorp's incorporation theory and hold that there is no "property damage" unless and until the incorporation of a defective product or component results in "physical injury to tangible property" in at least some part of the system.

Id. at 863.

In Esicorp, there was a second holding, but this second holding, like the first, did not require our court to define the phrase "because of" or determine what degree of attenuation this phrase encompassed. The insurer in Esicorp had conceded that

about $11,000 of damages, in fact, comprised property damage. That amount was a minute fraction of the overall, asserted loss of over $3 million. We did not reach the question of what fraction of the $3 million could be deemed covered damages as falling within the policy's "because of" language. Rather, we noted that the insured bore the burden of proving coverage but had failed to present evidence or arguments attempting to apportion the $3 million between damages not covered by the policy and covered damages that existed "because of" the conceded $11,000 in property damage. We stated:

> It is apparent from Esicorp's damage evidence that the vast bulk of the $3,046,709 loss allegedly attributable to SLT's negligent inspection were the costs of repairing the defective welds in the field and the consequential damages caused by the need to undertake those repairs. Esicorp made no attempt to apportion either its total loss or the settlement amount between these direct and consequential repair costs, which were not covered property damage, and the direct and consequential costs resulting from the limited damages Liberty Mutual concedes were covered. Esicorp, in suing as assignee of SLT, had the insured's burden to prove that its losses fell within the policy's insuring agreement.

Id. at 864. Because we decided Esicorp based on a failure of proof, and because we did not reach the hard question of defining the degree of attenuation described by the policy in question, we reject American's argument that Esicorp stands for the general proposition that direct and consequential damages can never be covered under policy language like that used in Esicorp.

Finally, even if we were to view Esicorp as setting forth a strictly limiting standard for the scope of insurance coverage, American's argument would appear to force us to choose between two lines of authority: cases interpreting the phrase "because of," on the one hand, and cases interpreting the phrase "resulting from," on the other. As explained above, the "resulting from" cases are the source for the

-13-

"reasonably apparent" or "natural and reasonable incident or consequence of" test. Poage, 203 S.W.3d at 787. Neither line of authority directly discusses the actual policy language at issue in our case, so the question becomes whether one phrase is more analogous to the present policy's phrase "as a result of" than the other.

We believe it is a close question whether the ambiguous and untested language of the present policy—"as a result of"—is more closely analogous to the phrase "because of" as argued by American or the phrase "resulting from" as addressed in Poage, 203 S.W.3d at 785-88, and in the several cases cited therein. Given the above-stated rule that we must resolve ambiguities in favor of coverage, our search for analogous language naturally should lead us to accept comparisons between phrases more likely to result in coverage rather than phrases likely to defeat coverage. If one of the causative language phrases from insurance policies addressed by prior Missouri cases unambiguously stood out as more akin to the present policy language, there would be no need for application of this general rule of interpretation. No such clarity exists in the present case, however, so there is no compelling reason to conclude that American's favored phrase should guide our analysis.

B. Economic Loss

Regarding American's characterization of the indemnity award as an un-recoverable economic loss, there is no language in the policy excluding economic loss or economic harm from the definition of "Loss." American cites American States Ins. Co. v. Mathis, 974 S.W.2d 647 (Mo. Ct. App. 1998), in support of the proposition that economic loss must be excluded notwithstanding the absence of policy language mandating such a result. Mathis, however, did not involve a refusal to extend property damage coverage to an economic loss causally related to a claim of property damage. Rather, the court in Mathis held that the underlying claim itself was a straightforward breach of contract claim and that the resulting loss was an economic loss causally

-14-

related to the underlying breach of contract claim rather than a property damage claim. Id. at 650.

In the present case, as explained above, the indemnification award for the surety's fees was "reasonably apparent" and a "natural and reasonable incident or consequence" of the underlying property damage claim. As such, American's economic-loss theory in this case is simply an extension of its causation argument: American would have us terminate the chain of causation at the indemnity agreement and not look behind the indemnification award to determine the nature of the underlying arbitration claim. We have already rejected this limited approach to defining the causal-nexus requirement under the present policy.

C. Exclusions

Finally, American argues that even if coverage would otherwise exist, the following exclusion applies:

> This policy does not provide coverage and the company will not pay Loss for: Any Claim based upon or arising out of liability of others assumed by the Insured under any contract or agreement.

The district court found this exclusion did not apply because Spirco did not assume the liability "of others." According to the district court, Spirco merely agreed to indemnify its surety, whose liability as surety was limited to that of Spirco, the principal. Spirco urges us to adopt the position of the district court. In addition, Spirco argues that an exception to this exclusion applies. The exception Spirco relies upon provides, "This exclusion does not apply to liability: . . . 3. That the Insured would have in the absence of the contract or agreement."[4]

---

[4]We note the inconsistency between this argument (that the duty to indemnify the surety exists as a matter of common law without regard to any contractual duty)

If the award at issue were an amount the surety was required to pay, as surety, to cover an obligation that Spirco owed to a third party (for example, if arbitration had resulted in an award against Spirco and in favor of the New Jersey Property owner), the inapplicability of the cited exclusion would be beyond dispute. In such a situation, the amount paid by the surety unquestionably would have been Spirco's own liability paid by the surety, and not a liability "of others." Here, however, the fees at issue were amounts the surety reasonably expended to protect itself and Spirco, and it is less clear that the award of fees and expenses under the indemnity agreements should be characterized as Spirco's own liability rather than the liability of "others" assumed by Spirco.

Although this issue is close, we believe the district court reached the correct conclusion in rejecting application of the exclusion and finding that the underlying fee award did not represent a "liability of others assumed by the Insured under any contract or agreement." This ambiguity, like that discussed above, must be resolved in favor of coverage. Killian v. State Farm Fire & Cas. Co., 903 S.W.2d 215, 217 (Mo. Ct. App. 1995) ("When an insurance company relies on a policy exclusion to assert noncoverage, it has the burden of proving that such an exclusion is applicable, and we will construe the exclusion clause strictly against the insurer."). Given the nature of the insureds' business, it would have been apparent that surety contracts were part and parcel of the insureds' everyday operations. To the extent the surety's defense and the Spirco's defenses were partially aligned in arbitration, the defense costs were, at least in part, incurred for the protection of Spirco. As such, it was proper to characterize these fees as Spirco's own expense. We are unwilling to parse the nature of the liability more finely in an effort to label some portions as Spirco's own liability and other portions as the "liability of others" that Spirco merely assumed under contract. If American had desired to parse coverage as to liabilities owed to a

and the losing arguments that Spirco and the other indemnitors advanced in today's companion case (that no duty to indemnify the surety exists as between the surety and the indemnitors).

-16-

surety as finely as it now urges, it needed to be explicit in drafting the policy. Given the need to resolve ambiguities in favor of coverage, we hold that the amounts owed by the insured to the surety, whether in satisfaction of the surety's attorney fees or in satisfaction of an underlying payment on the surety bond, are the insureds' own liabilities and not liabilities of another assumed by contract.

In any event, even if the exclusion were otherwise applicable, we conclude that Spirco is correct in its argument that the exception to the exclusion would apply. The exception states, "This exclusion does not apply to liability: . . . 3. That the Insured would have in the absence of the contract or agreement." Although no Missouri case has explicitly held that a common law, non-contractual duty to indemnify a surety extends to reasonable fees and expenses, general surety law provides that the implicit duty to indemnify a surety extends to those sums required to make the surety whole. See, e.g., U.S. Fid. & Guar. Co., 17 F.2d at 916 (applying Missouri law and holding that an "implied contract" of indemnification arises from a contract of suretyship). We believe that, if faced with this question today, the Missouri Supreme Court would recognize that the duty to indemnify a surety is a duty to make the surety whole. Accordingly, we hold in the alternative that Spirco had a duty to indemnify the surety independent of the duty imposed by the general indemnity agreements such that the exception to the exclusion applies.

Because there is coverage and no exclusion defeats coverage, we affirm the judgment of the district court.

_____

-17-